Commonwealth *v.* Durand.

## Commonwealth *vs.* Eric J. Durand.

Bristol. March 5, 2010. - August 19, 2010.

Present: Marshall, C.J., Ireland, Spina, Botsford, & Gants, JJ.

*Homicide. Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,* Capital case, Confrontation of witnesses, Admissions and confessions, Voluntariness of statement, Instructions to jury. *Evidence,* Expert opinion, Hearsay, Admissions and confessions, Voluntariness of statement, Scientific test. *Witness,* Expert.

At a murder trial, the admission in evidence of testimony from a substitute medical examiner concerning the factual findings contained in an autopsy report prepared by a different medical examiner who had conducted the autopsy of the victim, in violation of the defendant's constitutional right of confrontation, was not harmless beyond reasonable doubt, where the cause of death was very much a disputed issue at trial, and where the erroneously admitted testimony included graphic descriptions of the minor victim's injuries, provided an important factual basis supporting the substitute medical examiner's opinions concerning the cause of death, and had obvious relevance to the issue of extreme atrocity or cruelty. [581-588]

At a murder trial, the admission in evidence of a medical expert's testimony concerning the contents of certain studies not in evidence did not constitute a confrontation clause violation, where the studies were not testimonial; however, the testimony was hearsay in any event, and was inadmissible on direct examination. [588-590]

At a criminal trial, the admission in evidence of a statement made by the defendant about throwing an object at the victim, despite the fact that the statement had earlier been ordered suppressed because it was found to be involuntary, was constitutional error that gave rise to a substantial risk of a miscarriage of justice and required reversal of the defendant's conviction of assault and battery by means of a dangerous weapon. [590-593]

A Superior Court judge hearing a criminal defendant's pretrial motion to suppress statements made by the defendant to police officers during two interviews did not err in concluding that the defendant's statements were voluntary, where the circumstances demonstrated that, although the officers used a variety of improper interrogation techniques, the incriminating statements made by the defendant were not tied to or otherwise in response to the tactics employed by the officers, and that the defendant's will was not overborne. [593-598]

Discussion of issues likely to arise on retrial of a murder case. [598-599]

Indictments found and returned in the Superior Court Department on December 11, 2003.

A pretrial motion to suppress evidence was heard by *Robert J. Kane*, J., and the cases were tried before *D. Lloyd Macdonald*, J.

*Gary G. Pelletier* for the defendant.

*Shoshana Stern*, Assistant District Attorney (*Rachel J. Eisenhaure*, Assistant District Attorney, with her) for the Commonwealth.

BOTSFORD, J. A jury found the defendant, Eric J. Durand, guilty of murder in the first degree of Brendon Camara, the four year old son of the defendant's girl friend, on a theory of extreme atrocity or cruelty.[1] The defendant was found guilty as well of assault and battery with a dangerous weapon, a plastic toy shark; the victim was again Brendon Camara. He appeals from his convictions and from the denial of his motion for a new trial.[2] He argues that his convictions must be reversed because, among other reasons, (1) a substitute medical examiner and another medical expert were permitted to testify, over objection, to the contents and factual findings contained in the autopsy report prepared by a different medical examiner who had conducted the autopsy of the victim; (2) evidence was introduced at trial of a statement made by the defendant about throwing the toy shark, even though that statement had earlier been ordered suppressed because it was found to be involuntary; and (3) evidence of statements made by the defendant to police during two interviews should have been suppressed and not admitted at trial. We conclude that the testimony concerning the factual contents of the autopsy report prepared by a nontestifying medical examiner violated the defendant's constitutional right of confrontation, see *Crawford* v. *Washington*, 541 U.S. 36, 53-54 (2004); *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 5-10 (2005), cert. denied, 548 U.S. 926 (2006), and that in the circumstances of this case the error was not harmless beyond a reasonable doubt. Accordingly, we reverse the defendant's conviction of murder. We further conclude that the introduction of the defendant's involuntary

---

[1]The jury did not find the defendant guilty on a theory of deliberate premeditation.

[2]Because the issues raised by the defendant in his motion for a new trial are substantially the same as the ones raised in this direct appeal, we do not consider them separately.

statement requires reversal of his conviction of assault and battery by means of a dangerous weapon. With respect to the defendant's other statements, there was no error in the denial of the defendant's motion to suppress.[3]

1. *Background.* We summarize the facts as the jury could have found them, reserving certain facts for later discussion. At the time of the victim's death in October, 2003, he was living with his mother, Laura Bowden (Bowden), and his twin brother Michael in the basement of a house belonging to Paul Paquette in Somerset. Also living in the house at the time were Paquette, his two daughters, Priscilla and Patricia Paquette, and their children. Bowden was a close friend of Patricia Paquette (Patricia), in particular. The defendant was Bowden's boy friend, and had been, off and on, for approximately one year. He was not the father of her twins, who were born in November of 1998, but he had two young children of his own. He frequently stayed with Bowden at the Paquette house.

Although the defendant appeared to develop a good relationship with the victim's brother, treating Michael like his own child, it did not seem that he cared for the victim. The defendant called the victim — who was a little smaller than his brother, was very attached to his mother, had speech difficulties, and would wet his bed and his pants — "cry baby" and "pissy pants," and at times seemed as though he liked to upset the victim. He wanted the victim to be tougher, to cry less often, and to be more like Michael. The victim, in turn, was intimidated by the defendant, and would sometimes become visibly upset by the defendant's presence. Bowden gave the defendant permission to discipline Michael and the victim, but never saw him hit either one of them. However, Bowden would herself sometimes discipline her sons by hitting their hands or bottoms, and on one occasion, she slapped them in the face.

On the day before the victim's death, the defendant and his two children spent time with Bowden, Michael, and the victim, as well as Patricia and her son, in the basement of the Paquette house. The defendant spent the night at the house. The following morning, October 20, Bowden woke at approximately 6 A.M.; she was scheduled to be at work at 7 A.M. She woke the defendant,

---

[3]The defendant makes other claims of error that we consider *infra.*

but the defendant said it was already too late for him to go to work and he went back to sleep. When Bowden left the house at 6:30 A.M., the victim and Michael also were asleep.

At around 9 A.M., Patricia woke up and went into the twins' bedroom. She found them partially awake and still in bed. At around 10 or 10:30 A.M., she returned to the boys' bedroom, and found them out of bed and playing. At that time, the defendant was on the bed in Bowden's room, and Patricia went to talk to him. At some time around 10 A.M., Bowden telephoned while she was on her half-hour break. She spoke briefly to Patricia, who answered the telephone, and then to the defendant for the rest of her break. During the conversation, Michael and the victim went into Bowden's room and the defendant asked the victim if he "peed his pants." When the victim did not say any- thing, Patricia felt his pants and told the defendant they were wet. The victim then asked if he could use the bathroom and the defendant asked, "Why do you need to go to the bathroom if you peed your pants?" The defendant also told Bowden that the victim was asking to go the bathroom but that he did not think he had to go because he already urinated on himself. Bowden told the defendant to let him go. The telephone conver- sation ended shortly thereafter.

The defendant put the victim "in the corner" as punishment. While Patricia and the defendant talked, the victim stayed in the corner with his face to the wall, but kept moving around. At some point, the defendant called him "piss pants," and when the victim turned around in response, the defendant threw a toy shark at his face. The victim cried when the shark hit him in the mouth, but the defendant told him that he did not throw it that hard. Still crying, the victim turned back to face the corner.

When the victim "got out of the corner," Patricia brought the defendant a face cloth, and seeing the defendant begin to take care of the victim's wet clothes, she started upstairs to the kitchen. Before she got there, however, the defendant walked up to her with the victim and told her that the victim had urinated on the defendant's leg, and showed her the wet spot on his pants. Although Patricia thought the defendant seemed upset, the defendant said he could just go home and get another pair of pants. The defendant took the victim into the upstairs bathroom

to wash him while Patricia went to the kitchen and began washing dishes. At some point, Patricia saw the defendant walk by the sink with the victim and believed they were going downstairs to the basement.

After finishing the dishes, Patricia went into the living room to check on her son. She saw Michael in the living room and told him that she was going to bring him downstairs to the defendant. When she did so, Patricia saw the defendant next to the door of Bowden's room and the victim lying on the bed in his own room. Patricia observed that the victim was not moving, but also that he did not look as though he were in any distress.

Patricia returned upstairs and used the computer in the living room. At some point, the defendant approached her and told her that Michael had come upstairs and told him that the victim had fallen down the stairs. Although Patricia remained at the computer after hearing this, the defendant retreated to the basement. A few minutes later, however, the defendant reappeared and told her that the victim was "acting weird." Again, Patricia remained at the computer, and the defendant went downstairs to the basement. A couple of minutes later, the defendant returned a third time and told Patricia that there was something seriously wrong with the victim. Patricia ran down the stairs and into the twins' bedroom; the victim was lying on the bed, not moving, and his eyes were rolled back. Patricia tried talking to him, checked for his pulse and heartbeat, and held the victim in her arms. The defendant, who had followed Patricia down the stairs, looked scared and was asking why this happened; he asked the victim if the victim was not responding because he was mad at the defendant.

The defendant told Patricia to telephone Bowden at work. After Patricia made the telephone call, the defendant took the telephone from her and told Bowden that the victim had fallen down the stairs, walked to the bed, and was now not responding. Bowden instructed the defendant to telephone 911, and he did so. Bowden immediately left work to go home.

The Somerset police 911 dispatchers received two calls from the Paquette house, one at approximately 12:15 P.M., and one four to five minutes later. The responding police officers were told by the defendant that the victim had fallen down the stairs

and was not breathing; the defendant then directed the officers to the basement where the victim was on the bed. The officers administered cardiopulmonary resuscitation to the victim, who did not respond. Paramedics arrived within minutes. The defendant similarly told the paramedics that the victim had fallen down four to five stairs and was not unconscious at the time of the fall, but rather had gotten up, walked to the bed, lay down, and did not cry or complain that anything hurt.

Bowden arrived after the police and ambulance were at the scene. She went to the basement and observed Patricia and the defendant, who was crying and saying he was sorry. The paramedics transported the victim to the emergency room of Charlton Memorial Hospital in Fall River. After continued attempts to revive the victim at the hospital, he was pronounced dead by an emergency room doctor.

On that same day, the defendant was asked if he would accompany officers to the police station for an interview. The defendant agreed, and was interviewed beginning at approximately 2 P.M. by Trooper William Serpa of the State police and then-Detective Lieutenant Joseph Ferreira of the Somerset police department.[4] The interview lasted approximately six hours. At some point during the interview, the officers told the defendant that the victim had died and further informed him that the victim's injuries were not consistent with a fall down the stairs. Although the police pressured the defendant, he repeatedly denied any involvement in the victim's death. The entire interview was videotaped. The defendant thereafter left the police station. Later that evening, he telephoned Patricia. Among other things, he told her that she should not say anything to the police about his throwing the toy shark at the victim because "they didn't need to know."

On October 21, 2003, Bowden went to the defendant's parents' house and spoke with the defendant. He told her that the boys were on the stairs together and that Michael told him that was how the victim fell. While Bowden was there, then-Sergeant Glenn Neto of the Somerset police department and Trooper John Hubbard of the State police arrived and asked whether the defendant would agree to participate in another interview; the

---

[4]At the time of trial in 2006, Joseph Ferreira was serving as chief of the Somerset police department.

defendant indicated that he would. The second interview began at approximately 6 P.M. During its course, Sergeant Neto informed the defendant that the victim's autopsy report eliminated a fall down the stairs as the cause of death, and showed the death was caused by a blow to the victim's stomach. The defendant again denied involvement in the victim's death. He did, however, acknowledge that on the previous day he had tossed a plastic shark at the victim "to make him turn around" when he was in the corner, and said the shark may have hit the victim in the leg or in the hip. This second interview was also videotaped. Three days later, the defendant was arrested and charged with the two crimes at issue.

Dr. Abraham Philip, a medical examiner then employed by the Commonwealth, performed an autopsy on the victim within a day of his death. Dr. Philip did not testify at trial, but according to Dr. Mark Flomenbaum, who at the time of trial in 2006 was the chief medical examiner for the Commonwealth and testified in Dr. Philip's stead, the autopsy showed multiple external bruises over the victim's back and on his arms and head. He opined it was unlikely that a single event had caused each of these injuries, but that they likely occurred within minutes or hours of each other. Of particular importance was an abrasion just below the victim's rib cage — which in Dr. Flomenbaum's opinion was an "unusual place to get trauma" — because the internal injury was centered below that scratch. With respect to internal injury, Dr. Flomenbaum testified that the victim's duodenum (which he described as the "first part" of the small intestine into which the stomach empties) had been severed from the stomach, and his pancreas had suffered a complete transection. Dr. Flomenbaum opined that these two injuries were fatal, and that they were not due to a fall down the stairs or from another child jumping on the victim. Rather, the injuries occurred from a "forceful squeezing," with pressure applied at the point of the abrasion, which pushed the organs against the victim's spine. This squeezing was the mechanism of the victim's death.

The Commonwealth also called as a witness Dr. Amy Goldberg, a pediatrician specializing in the area of child protective services, to testify concerning the rarity of the injuries suffered by the victim. Dr. Goldberg, like Dr. Flomenbaum, recited to

the jury several findings contained in the autopsy report, including findings related to the transection of the victim's pancreas, the severing of his small intestine from the stomach, and the significant amount of blood in his abdominal cavity, as well as the fact that the victim had several external abrasions and lacerations and had suffered intraoral trauma. Based on these findings, as well as several studies that examined combined intestinal injuries in children and different sorts and grades of intra-abdominal trauma, Dr. Goldberg opined that the victim's injuries were not caused by a stairway fall, but were likely the result of severe trauma. It was her opinion that the blunt force applied to the victim could have been in the form of a punch or kick and would have resulted in immediate and significant pain.

2. *Discussion. a. Medical testimony and right of confrontation.* The defendant argues that the trial judge erred in permitting Dr. Flomenbaum and later Dr. Goldberg to testify to factual data contained in Dr. Philip's autopsy report.[5,6] He argues that this testimony violated his right to confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[7] The defendant raised this objection before and at the outset of Dr. Flomenbaum's testimony, and thus it is preserved.[8] The defendant argues that the error was not harmless beyond a reasonable doubt. In the circumstances of this case, we agree.

---

[5] The autopsy report itself was not offered or admitted in evidence.

[6] The defendant argues in addition that the judge erred in permitting Dr. Goldberg to describe, during her direct examination, factual findings contained in studies she did not author. We consider this additional contention following the discussion of the autopsy report.

[7] The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Article 12 of the Massachusetts Declaration of Rights provides that in a criminal trial "every subject shall have a right to produce all proofs, that may be favorable to him [and] to meet the witnesses against him face to face." With respect to questions that involve the relationship between the hearsay rules and the right to confrontation, "the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment . . . ." *Commonwealth* v. *Nardi*, 452 Mass. 379, 388 n.10 (2008) (*Nardi*), quoting *Commonwealth* v. *DeOliveira*, 447 Mass. 56, 57 n.1 (2006).

[8] Although the Commonwealth agrees that there was a sufficient objection made to Dr. Flomenbaum's testimony in this regard, it points out that no such objection was made to the portion of Dr. Goldberg's testimony that related to findings contained in the autopsy report. We discuss this point *infra.*

i. *Dr. Flomenbaum.* Before Dr. Flomenbaum testified, the defendant moved in limine to preclude the Commonwealth from admitting evidence concerning Dr. Philip's autopsy report "unless evidence of the examination is first admitted through in court testimony from Dr. Philip." The motion was based on the confrontation clause; the defendant maintained that Dr. Philip was not an unavailable witness, as he had a residence in Massachusetts and the Commonwealth could produce him as a trial witness; that the autopsy report was testimonial in nature; and that the defendant had no prior opportunity to cross-examine Dr. Philip.[9]

Relying on this court's decision in *Commonwealth* v. *Verde,* 444 Mass. 279 (2005), and the public records exception to the hearsay rule, the judge ultimately denied the defendant's motion, finding no violation of the confrontation clause.[10] In his ruling, the judge simultaneously determined that he was not going to allow Dr. Flomenbaum free rein with regard to his use of Dr. Philip's autopsy report — and particularly Dr. Philip's opinions — but would permit Dr. Flomenbaum to use the factual data contained in the report. The defendant renewed his objection at the time Dr. Flomenbaum testified, and the judge again denied it.

[9]In a hearing on the motion on the first day of trial testimony, defense counsel further argued that Dr. Philip had considerable discretion in performing the examination of the victim's body and in the opinions that he formed, and also that without Dr. Philip as a witness, the defense would be unable to ask Dr. Flomenbaum what led Dr. Philip to draw certain conclusions concerning the cause of the victim's death. While acknowledging that the defendant could not obtain this information from Dr. Flomenbaum, the judge indicated that the defendant could call Dr. Philip himself. The defendant responded, "I could . . . but that places the burden upon us to rebut, when we have a right under the confrontation clause to confront all accusers here." The defendant's position finds support in *Melendez-Diaz* v. *Massachusetts,* 129 S. Ct. 2527, 2540 (2009) ("the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court").

[10]In *Melendez-Diaz* v. *Massachusetts,* 129 S. Ct. at 2532, the Supreme Court held that drug certificates are testimonial statements implicating the protections afforded under the confrontation clause; this decision "abrogated" the underpinning of our decision in *Commonwealth* v. *Verde,* 444 Mass. 279 (2005). *Commonwealth* v. *Vasquez,* 456 Mass. 350, 352 (2010). Moreover, in *Nardi,* 452 Mass. at 393-394, this court both rejected the claim that the hearsay exception for public or official records applied to permit the autopsy report in evidence at the defendant's trial, and determined that the statements made by the medical examiner contained in the autopsy report are testimonial in fact, thus implicating the confrontation clause. See Mass. G. Evid. § 803 (8) (2010). The *Melendez-Diaz* and *Nardi* cases were decided after the trial in this case.

In preparation for his testimony, Dr. Flomenbaum reviewed the autopsy file created by Dr. Philip and the victim's emergency room medical records. He also examined the autopsy photographs taken by both Dr. Philip and police officers who had been present at the autopsy; a report prepared by Dr. Kate Crowley, a forensic dentist in the medical examiner's office (who also testified at trial); and approximately twelve microscope slides that Dr. Philip had prepared by taking pieces of tissue from different organs and other parts of the victim's body. At trial, Dr. Flomenbaum testified, with respect to the external examination of the victim, that "Dr. Philip catalogued nine injuries to the face and neck, three to the torso, and nine to the extremities . . . ." He also described in detail the location of various bruises and scratches on the victim's body that covered his head, chest, extremities, and back, and showed the jury photographs of these contusions. In his discussion of the internal examination, Dr. Flomenbaum described the victim as having "two major injuries in the same area, both of which were fatal." He further stated, "[W]hat was observed was blood in the belly cavity, and the organs that were damaged which caused the bleeding was [the] small intestine — the duodenum was completely severed from the stomach. It was torn, just torn. It was ripped apart. And the organ under it, the pancreas, was also torn." Dr. Flomenbaum's testimony concerning the victim's internal injuries was informed by his review of a photograph, not shown to the jury, which he testified showed that the injuries did not result from a slow tearing but rather was "an abrupt cut off with a fatal bleed," and by microscopic slides (also not in evidence) that he testified showed, by virtue of the lack of any white blood cells present to stop the bleeding, that the fatal bleed was not a slow process but rather likely occurred over the course of minutes, or a couple of hours.

Based on these factual findings, Dr. Flomenbaum opined that the victim died as a result of bleeding from his injured organs, and that the injury was purely blunt trauma likely caused by a "forceful squeezing." Although Dr. Flomenbaum could not be sure of the amount of time that would have lapsed between when the injuries were inflicted and the time of death, he opined that it was relatively quick and that the victim would have lost consciousness from loss of blood.

Dr. Flomenbaum's trial testimony, and the defendant's motion in limine and trial objection concerning Dr. Flomenbaum's testimony, occurred after *Crawford* v. *Washington*, 541 U.S. 36 (2004) (*Crawford*), *Commonwealth* v. *Gonsalves*, 445 Mass. 1 (2005), cert. denied, 548 U.S. 926 (2006), and *Commonwealth* v. *Verde*, 444 Mass. 279 (2005). However, the case was tried before this court's decision in *Commonwealth* v. *Nardi*, 452 Mass. 379 (2008) (*Nardi*). In *Crawford, supra* at 53-54, 58 n.8, 68, the Court held that the Sixth Amendment prohibits the admission of testimonial statements unless the declarant testifies at trial or is formally unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. The *Crawford* decision required us to address, in *Nardi*, the admissibility of testimony of a substitute medical examiner who did not personally perform the autopsy of the victim.

In particular, in *Nardi*, we affirmed the proposition that testifying expert witnesses may base their opinions on (1) facts personally observed; (2) facts assumed in the questions put to the expert and supported either by admitted facts or by the testimony of other witnesses already given or to be given at the trial; or (3) facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion. *Nardi, supra* at 388, quoting *Commonwealth* v. *Markvart*, 437 Mass. 331, 337 (2002). See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531 (1986). A substitute medical examiner may testify as to his or her own opinion concerning the victim's cause of death,[11] even though the testimony is based principally on the autopsy performed by an unavailable pathologist, because the substitute medical examiner's opinion is subject to cross-examination. *Nardi, supra* at 388-391. However, a testifying medical examiner called by the Commonwealth is not permitted to testify, on direct examination, to the underlying factual findings contained in the autopsy report prepared by a different medical examiner, because such testimony would violate a defendant's confronta-

---

[11]In *Commonwealth* v. *Avila*, 454 Mass. 744, 761 (2009), we clarified that testifying substitute medical examiners are not limited to offering opinions regarding the cause and manner of death, but may also offer opinions on related issues within the scope of their expertise.

tion rights. *Nardi, supra* at 391. See *Commonwealth* v. *Avila,* 454 Mass. 744, 760-762 (2009). See generally Mass. G. Evid. § 705 (2010).

In the present case, as *Nardi* makes clear, to the extent that the defendant sought to require the Commonwealth to call Dr. Philip as a trial witness because he was the only witness who could offer an opinion as to the victim's cause and manner of death, the defendant's motion and objection were properly denied. However, the portion of the judge's ruling that permitted Dr. Flomenbaum to testify to factual findings contained in Dr. Philip's autopsy report was error. See *Nardi, supra* at 388-391. Accord, e.g., *Commonwealth* v. *Mercado,* 456 Mass. 198, 210-211 (2010); *Commonwealth* v. *Avila, supra*; *Commonwealth* v. *Hensley,* 454 Mass. 721, 732-734 (2009).

The Commonwealth argues that even though some of Dr. Flomenbaum's testimony appeared to repeat factual findings contained in Dr. Philip's autopsy report, the testimony was properly admitted nonetheless because Dr. Flomenbaum did not refer specifically to Dr. Philip's report; the information revealed regarding the injuries to the victim's duodenum and pancreas need not have been derived from that report; and Dr. Flomenbaum could not have rendered his opinion without disclosing these facts. We disagree.

That Dr. Flomenbaum did not mention specifically Dr. Philip or his report does not alleviate the hearsay or confrontation problems at issue because the absence of any such reference does not transform the testimony into anything other than a recitation of the facts or observations contained in the autopsy report. In any event, we disagree with the Commonwealth that Dr. Flomenbaum did not reference the facts contained in the report. He answered a question concerning the internal injuries by stating, "[W]hat was observed was . . . ," thereby implicitly referring to his review of Dr. Philip's report.[12] Finally, the Commonwealth's

---

[12]We also reject the Commonwealth's claim that Dr. Flomenbaum had a sufficient and appropriate basis for the testimony because he made reference on cross-examination to photographs that may have shown the victim's internal injuries. While this may be true, it is beside the point. The photographs of the victim's internal injuries were not offered or admitted in evidence. The issue here is not whether Dr. Flomenbaum had a sufficient factual basis to support his testimony, but whether and in what ways his testimony may have violated the confrontation clause as well as our rules of evidence.

assertion that testimony on direct examination concerning the facts of the victim's internal injuries was somehow necessary to allow Dr. Flomenbaum to offer an opinion fails; it directly contradicts the holding of *Nardi*.[13]

As indicated, because the defendant's constitutional objection on confrontation grounds to this aspect of Dr. Flomenbaum's testimony was properly preserved, we review to determine whether the error was harmless beyond a reasonable doubt. See *Nardi, supra* at 394. See also *Commonwealth* v. *Galicia*, 447 Mass. 737, 746 (2006).

The cause of death was very much a disputed issue. Around the time of the death, the defendant had explained to a number of people, including the police who interrogated him at length, that Michael told him the victim had fallen on the stairs to the basement, implying that the death was the result of a terrible and tragic accident. At trial, the defendant's counsel pursued this theory through her questioning of a number of witnesses. Counsel also sought to elicit from various witnesses information that could support other theories, primarily that Michael may have jumped or stomped on the victim, causing fatal injuries, or that the victim had been injured at some time before the morning of

---

[13]We recognize that the distinction drawn in *Nardi*, which permits a substitute medical examiner to testify on direct examination as to his or her opinion but not to the facts that may underlie that opinion, has sometimes proven difficult to apply during the course of a trial. See, e.g., *Commonwealth* v. *Mercado*, 456 Mass. 198, 210-211 (2010); *Commonwealth* v. *Taylor*, 455 Mass. 372, 376-378 (2009); *Commonwealth* v. *Avila*, 454 Mass. 744, 759-760 (2009). Nevertheless, the distinction is necessary to ensure that a defendant's constitutional right to confrontation — a right that has been described as a "bedrock procedural guarantee," *Crawford* v. *Washington*, 541 U.S. 36, 42 (2004), citing *Pointer* v. *Texas*, 380 U.S. 400, 406 (1965) — is adequately preserved, and we do not now seek to change the *Nardi* framework. We do, however, offer the following suggestion.

It is common practice for a State trooper or, as was true in this case, a police officer from a local city or town, or both, to attend a victim's autopsy. If such an officer is able to authenticate photographs taken, and slides prepared, at such an autopsy, the photographs or slides could properly be admitted in evidence at trial through the officer. If this were done, a substitute medical examiner would be in a position to describe for the jury what he or she observed in such photographs or slides, or both, and to support opinions with them, even if the substitute examiner's observations happen to correlate exactly with those contained in the autopsy report. See, e.g., *Commonwealth* v. *Avila, supra* at 763 n.19. Contrast *Commonwealth* v. *Rodriguez, ante* 461, 477 (2010).

October 20 when the defendant was alone with him, and that he had slowly bled to death thereafter.

In contrast to the means suggested by defense counsel, Dr. Flomenbaum offered the jury an unwavering opinion that the victim died as a result of blunt force trauma, in particular, a "forceful squeezing." Although Dr. Flomenbaum's opinion testimony was properly admitted, the graphic descriptions that Dr. Flomenbaum provided of the victim's injuries — including the victim's external bruises and lacerations[14] and particularly the internal tearing and severing of two major organs[15] — were not. These descriptions, however, provided an important factual basis that undergirded and supported Dr. Flomenbaum's opinions. Moreover, the factual findings described by Dr. Flomenbaum during his direct testimony had obvious relevance to the issue of extreme atrocity or cruelty. In recognition that the "standard of harmlessness beyond a reasonable doubt is a stringent one," *Commonwealth* v. *Vasquez*, 456 Mass. 350, 361 (2010), we cannot conclude that the erroneously admitted testimony concerning the injuries to the victim, including both his external bruises and the internal trauma to his organs, had little or no effect on the jury's decision to convict the defendant of murder in the first degree on a theory of extreme atrocity or cruelty. See *id.* at 361-362. See also *Chapman* v. *California*, 386 U.S. 18, 23 (1967), quoting *Fahy* v. *Connecticut*, 375 U.S. 85, 86-87 (1963)

---

[14]The Commonwealth introduced through Dr. Flomenbaum a series of nine photographs taken at the victim's autopsy, and he provided detailed descriptions and explanations of each of the external injuries that could be observed in these photographs. Dr. Flomenbaum was not present at the autopsy, and thus could not properly authenticate the photographs as a fair and accurate representation of the victim's body or injuries. See *Commonwealth* v. *Weichell*, 390 Mass. 62, 77 (1983), cert. denied, 465 U.S. 1032 (1984), *S.C.*, 446 Mass. 785 (2006); *Commonwealth* v. *Figueroa*, 56 Mass. App. Ct. 641, 646 (2002) ("Photographs usually are authenticated directly through competent testimony that the scene they show is a fair and accurate representation of something the witness actually saw"). Although the photographs might properly have been introduced through a different witness, Joseph Ferreira of the Somerset police department, who had been present throughout the entire autopsy, see note 13, *supra*, this was not done, and the introduction of the photographs was without proper foundation, although the defendant did not object. See *Commonwealth* v. *Rodriguez, supra.*

[15]As noted, no photographs of the victim's internal injuries were admitted in evidence.

("The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction"); *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010) ("we ask whether, on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts").

ii. *Dr. Goldberg.* Dr. Goldberg, like Dr. Flomenbaum, testified to factual findings contained in the autopsy report prepared by Dr. Philip.[16] Like Dr. Flomenbaum's testimony, this constituted testimonial hearsay, violated the defendant's right of confrontation, and should not have been admitted.[17] *Nardi*, 452 Mass. at 391-394. There is no need to address this aspect of Dr. Goldberg's testimony separately. The defendant also contends, however, that Dr. Goldberg's testimony concerning the contents of "studies" not in evidence similarly violated the defendant's right to confrontation.

During direct examination, Dr. Goldberg testified that she reviewed several records and documents pertaining to the victim, including all the medical records from the medical examiner's office; the victim's pediatric records from his primary care physician; hospital records from Charlton Memorial Hospital[18]; photographs from the autopsy of the victim; a witness statement

---

[16]As an example, in response to a question asked by the Commonwealth concerning the witness's review of the autopsy report, Dr. Goldberg stated: "*The autopsy report noted that* the child had intra-abdominal injuries or injuries inside of his belly, his abdomen. Two organs in particular were injured. One, a solid organ, the pancreas, had a complete transection; and the small intestine from the stomach had been completely severed or ruptured, transected. Those are all terms that would describe what he had. The child also had multiple skin injuries described as abrasions and lacerations all over his body. He had some intra-oral trauma as well . . . ." (Emphasis added.)

[17]The defendant did not object to Dr. Goldberg's testimony on confrontation or hearsay grounds. However, because Dr. Flomenbaum's testimony alone would have been sufficient to require reversal, we need not address whether the defendant's failure to make such an objection would call for review under the substantial likelihood of a miscarriage of justice standard.

[18]Not only did Dr. Goldberg testify that she reviewed hospital records from Charlton Memorial Hospital, but she provided further testimony, in response to questions posed by the prosecutor on direct examination, describing their contents in detail. Although the hospital records could have been admitted in evidence in accordance with G. L. c. 233, § 79, see *Bouchie* v. *Murray*, 376

from a detective; and a document prepared by the witness's col-
league, Dr. Carole Jenny, and references cited in it. Dr. Goldberg
offered several opinions concerning the cause of the abdominal
injuries that the victim suffered, whether the cause of the victim's
injuries could have been caused by a stairway fall, and the amount
of force that would have been required to inflict the victim's
injuries. The judge, not the prosecutor, then asked the witness to
provide the basis of her opinion that the victim's injuries were
inconsistent with a fall down stairs. She answered that her opinion
was based on her clinical experience as well as her review of
medical literature and, in a separate question posed by the prosecu-
tor, described the substance of information contained in that
literature.[19]

We disagree with the defendant's assertion that Dr. Goldberg's
testimony concerning the content of the literature she reviewed
constituted a confrontation clause violation. The studies to which
she testified were not testimonial. See *Commonwealth* v. *Gon-
salves*, 445 Mass. at 3. Nevertheless, the testimony relating to the
contents of the studies constituted hearsay, and was inadmissible
on direct examination. See, e.g., *Commonwealth* v. *McNickles*,
434 Mass. 839, 857 (2001) ("an expert witness may not, on
direct examination, present the specifics of hearsay information

Mass. 524, 531 (1978), the Commonwealth never sought to introduce them as
an exhibit. Thus, Dr. Goldberg's testimony describing the contents of the rec-
ords was erroneous. See *Grant* v. *Lewis/Boyle, Inc.*, 408 Mass. 269, 274
(1990). See also *Commonwealth* v. *Markvart*, 437 Mass. 331, 338 (2002)
("The expert's direct examination may not be used to put before the jury facts
that are not . . . properly in evidence"); *Commonwealth* v. *Jaime*, 433 Mass.
575, 576-578 (2001) (expert may base opinion on facts or data that, although
admissible, have not actually been admitted in evidence, but expert may not
articulate that factual basis as part of direct examination); Mass. G. Evid.
§ 705 (2010).

[19]The witness stated: "[T]here have also been multiple studies, many more
than what we have cited in this record, that have looked at the injuries that
children sustain when they fall down stairs because they're so common, and
what is found and what I have found is that children really do not sustain seri-
ous — especially in comparison to the injuries that [the victim] has when they
fall down even a flight of stairs." She further provided, "Studies that looked
at intraabdominal trauma in children found that, as I just stated, many of the
reasons for that trauma was a high speed motor vehicle accident. They found
that children — and they looked at all intra-abdominal trauma; so stomach,
liver, pancreas, intestine, and all grades of those injuries to those organs.
When they looked specifically at combined pancreatic-intestinal injuries, all of
the children who had those injuries had suffered inflicted injuries."

on which she has relied in reaching her opinion"). See also Mass. G. Evid. §§ 802, 803 (18) (B) (2010).

b. *Involuntary statements admitted at trial.* On October 21, 2003, the second day on which the defendant was interviewed by police officers concerning the victim's death, he admitted to tossing a plastic shark to get the victim to turn around when he was in the corner, but added that he was sure the shark did not hit the victim in the face; that the shark may have hit the victim's leg or hip; and that "it wasn't anything big." In ruling on the defendant's motion to suppress statements he made to police during his two interrogations, the motion judge determined that these statements of the defendant concerning the toy shark were made involuntarily, and granted the defendant's motion to exclude them from introduction in evidence at trial.[20]

During trial, however, the defendant's admission to throwing the toy shark was introduced through the testimony of Chief Joseph Ferreira of the Somerset police department. During cross-examination, defense counsel, in an effort to support the position that the police investigation was prematurely focused on the defendant, suggested that the police did not learn any new information from their second interview of the defendant on October 21. Ferreira responded, "That's not correct," and stated

---

[20]During the October 21, 2003, interview, the following exchange took place:

SERGEANT NETO: "Eric listen to me. But there's also a certain time where you give them a little shove and they could fall and hit their head on the counter and something would happen. Does that make me a murderer, Eric?"

THE DEFENDANT: "No, it does not."

SERGEANT NETO: "Of course it doesn't make me a murderer. Did an accident happen? Yeah an accident happened. Should I go to jail for that? No. Should you go to jail for that? No. . . ."

The motion judge determined that the interrogating officers improperly implied a promise of leniency, and that the promise the defendant would not go to jail carried over to when the defendant was questioned concerning the toy shark. Accordingly, based on the rule against improper "minimization," see *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 436 (2004), and the Commonwealth's heavy burden to prove voluntariness, the motion judge ordered the statements suppressed. See also *Commonwealth* v. *O'Brian*, 445 Mass. 720, 726-728 (2006).

that the officers did receive additional information, some of which further incriminated the defendant. During redirect examination, the prosecutor informed the judge at a sidebar conference that the additional information alluded to during cross-examination included the suppressed statements concerning the toy shark, and asked that, in the circumstances opened by defense counsel, he be able to ask the witness what the new information was. The judge agreed, and the witness thereafter testified, "We learned that [the defendant] said that when he had put [the victim] in the corner, that he threw a shark at his face and cut his lip. A rubber shark." On appeal, the defendant argues that the introduction of this testimony was constitutional error and that it requires a reversal of both of his convictions.[21]

We agree with the defendant that the use of his involuntary statement at trial constituted constitutional error. See *Arizona* v. *Fulminante*, 499 U.S. 279, 306-312 (1991). Having been found involuntary by the motion judge, the defendant's statements concerning the toy shark were not "the product of a rational intellect and a free will," *Mincey* v. *Arizona*, 437 U.S. 385, 398 (1978), quoting *Townsend* v. *Sain*, 372 U.S. 293, 307 (1963), and should not have been used against him.[22] See *Mincey* v.

---

[21]We have already determined that the defendant's conviction on the murder charge must be reversed, and therefore we review this error only in relation to the conviction of assault and battery by means of a dangerous weapon.

[22]Relying on *Commonwealth* v. *Williams*, 379 Mass. 600, 606 (1980), the Commonwealth suggests that the decision to permit Chief Ferreira to testify to the defendant's involuntary statements was not improper. The argument fails. In *Williams*, the defendant moved to suppress a statement he made to police on the ground that it was coerced and involuntary. *Id.* at 604. The trial judge, however, postponed a hearing on the defendant's motion until the Commonwealth attempted to introduce the statement, and thus there was no finding of involuntariness. *Id.* The Commonwealth did not seek to introduce the statement in its case-in-chief. *Id.* Rather, the *defendant's* expert testified to the existence of the statement and that he considered it in forming his opinion as to the defendant's lack of criminal responsibility. *Id.* Thereafter, in the Commonwealth's case-in-rebuttal, the Commonwealth sought to introduce the statement itself, arguing that the jury had already heard testimony about it. *Id.* The judge admitted the statement and provided the jury with instructions that they were not to consider the truth of what was asserted but rather consider the statement only for the limited purpose of assessing the defendant's criminal responsibility. *Id.* at 605. This court concluded in *Williams* that the defendant's own use of the statement obviated any need for a hearing on its voluntariness. *Id.*

The differences between *Williams* and the present case are quite obvious

*Arizona, supra,* quoting *Jackson* v. *Denno,* 378 U.S. 368, 376 (1964) ("*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law" [emphasis in original]).

The defendant contends that this error is structural in nature and requires, notwithstanding that no trial objection was preserved on constitutional grounds,[23] automatic reversal. In contrast, the Commonwealth contends that such an error should be reviewed to determine whether there was a miscarriage of justice, and asserts that there was not. Although we recognize that the Commonwealth's position finds some support under Federal law — in *Arizona* v. *Fulminante,* 499 U.S. 279, 306-312 (1991), five Justices of the Supreme Court held that admission in evidence of a coerced confession (or involuntary statement) is a "trial error" subject to harmless error analysis rather than a "structural defect" in the trial mechanism — we do not now need to resolve whether the Massachusetts Constitution requires a similar standard of review or whether the structural error standard should apply. Here, the introduction of the defendant's statement concerning the toy shark gave rise to a substantial risk of a miscarriage of justice.[24] *Commonwealth* v. *Randolph,* 438 Mass. 290, 294-295, 297-298 (2002).

The error in admitting the defendant's own involuntary state-

---

and significant. Most prominently, the defendant's statement at issue here had previously been found involuntary. Moreover, no limiting instruction was provided at the time the statement was introduced during the redirect testimony of Ferreira or during the judge's instructions to the jury. Statements that are coerced or involuntary may not even be used to impeach a defendant's credibility, *Commonwealth* v. *Dwyer,* 448 Mass. 122, 132 (2006), never mind admitted substantively to support the truth of the matter asserted.

[23]During the sidebar conference in which the Commonwealth sought the judge's permission to introduce the involuntary statement, defense counsel stated: "Judge, my argument would be that all I asked was additional information. I didn't ask for specific information. He would testify that there were alleged other inconsistencies about where he was and what time. It wasn't necessarily referring to the shark." This argument focuses on counsel's belief that her cross-examination of Ferreira did not open the door for the introduction of the defendant's involuntary statement; it does not raise a constitutional objection.

[24]As indicated (see note 21, *supra*), we are reviewing the introduction of the involuntary statement only in relation to the conviction of assault and battery by means of a dangerous weapon. Accordingly, the defendant is not entitled to the more deferential standard that applies pursuant to G. L. c. 278, § 33E.

ment was compounded in this case by the fact that Chief Fer-
reira testified incorrectly to the defendant's words. During the
October 21, 2003, interview, the defendant stated that he tossed
the toy shark at the victim and hit him in the hip or the leg.
During trial, however, Ferreira testified that the defendant admit-
ted to hitting the victim in the face and cutting his lip. Thus, the
jury heard an admission that the defendant did not actually
make. For this reason, coupled with the fact of the constitutional
violation, "we are left with uncertainty that the defendant's
guilt [on the assault and battery by means of a dangerous weapon
charge] has been fairly adjudicated." *Commonwealth* v. *Azar*,
435 Mass. 675, 687 (2002), quoting *Commonwealth* v. *Chase*,
433 Mass. 293, 299 (2001).

c. *Motion to suppress.* The police interviewed the defendant
for approximately six hours on October 20, 2003, and for an ad-
ditional two hours on October 21. During the course of these
interviews, the defendant never confessed to causing the victim's
injuries, but he did make several incriminating statements.[25]
Before trial, the defendant filed a motion to suppress his state-
ments to police made during the interrogations. After an eviden-
tiary hearing, the motion judge (who was not the trial judge)
issued two separate memoranda of decision, both of which
included extensive findings of fact, based on his review of the
videotapes of the interviews, concerning the circumstances in
which the defendant made his contested statements. The judge
ultimately denied the defendant's motion, with the exception (dis-
cussed previously) of the defendant's statements concerning the
plastic shark that the judge ruled should be suppressed because
they were involuntary. The defendant now challenges the ruling
that his other statements were voluntary. Because all the other
statements at issue were made on October 20, we summarize the
judge's findings of that interview, supplemented by additional
facts based on our independent review of the videotape of that
interrogation.

Lieutenant Ferreira and Trooper Serpa conducted the October

[25]For example, on October 20, the defendant admitted to slapping Bowden
on the evening before the victim's death; kicking the victim on previous occa-
sions; and being frustrated with the victim for urinating on his leg that morning.
On October 21, during the second interview, the defendant made the statement
that he threw a plastic shark at the victim on the morning of his death.

20, 2003, interview, which began at 2 P.M. During the interview, the three men sat around a small table; at no time did the defendant leave the room. The interview began with the officers restating that the defendant agreed to have the interview audiotaped and videotaped, and informing him of his Miranda rights and of the fact that he was not under arrest.[26] The initial questions concerned the defendant's background, his relationship with the victim's family, the living arrangements at the Paquette house in Somerset, and the events leading up to the 911 call. During this time, Lieutenant Ferreira asked most of the questions, and did so in an even, neutral manner. The defendant responded "eagerly and comprehensively," often telling the officers that he wanted to do what was best for the victim and that he wanted to tell the truth.

At some point after 5:45 P.M., the tone of the questioning changed dramatically. The officers reported to the defendant that the information he had provided conflicted with information they received from interviews of others, and also told him that the victim had died. The news of the victim's death "destabiliz[ed]" the defendant. He got up from his chair, pounded his fist, stood in the corner, and cried. Over the course of the next two hours, the officers pressured the defendant to tell them what he did that resulted in the victim's death. In addition to focusing on their belief that the defendant was lying or not telling the full version of events, Lieutenant Ferreira and Trooper Serpa showed the defendant photographs of the victim from the emergency room after he was pronounced dead; yelled and screamed at him; told him that he had the opportunity to tell them what happened "because tomorrow is going to be too late"; and implied that perhaps whatever happened to the victim was an accident. The officers also told the defendant that they had children and would sometimes become frustrated with them and would hit them. Throughout, the defendant steadfastly and repeatedly denied any involvement in hurting the victim or in causing his injuries.

Eventually the defendant asked whether he could go home. The officers did not prevent him from doing so, but the defendant ultimately agreed to continue talking. The atmosphere then

---

[26]At the time the defendant agreed to be interviewed and throughout the beginning portion of the interview, he was unaware that the victim had died.

became somewhat lighter. Closer to the end of the interview, however, the police again increased the pressure, with Lieutenant Ferreira on one occasion standing "toe to toe" with the defendant, raising his voice, firing questions at the defendant, and interrupting the defendant's answers. Again, the defendant did not admit to any involvement in the victim's death. Finally, the interview ended and the defendant left.

Based on these facts, the motion judge determined that the defendant was not in custody at the time of the interview, but that even if the interview was a "custodial interrogation," the defendant intelligently and freely waived his Miranda rights and agreed to speak with the police. The judge then examined whether the defendant's will was overborne during the interrogation. He found that the prolonged pressure applied by the police constituted psychological coercion designed to overcome the defendant's resistance, and that the police improperly implied leniency and wrongly told the defendant that the interrogation represented his only opportunity to explain. Nevertheless, the judge determined that the statements given by the defendant were voluntary because, despite the use of improper interrogation tactics, the defendant repeatedly resisted police efforts to have him admit to striking the victim or explain how the victim died.

The defendant does not dispute the finding that he was not in custody at the time of the interrogation, but challenges the motion judge's determination of voluntariness. He argues that as matter of law his statements to police could not have been voluntary given the motion judge's other findings concerning the improper interrogation tactics used by both Lieutenant Ferreira and Trooper Serpa. There was no error.

In reviewing the defendant's claims, because we agree with the finding that he was not in custody, we focus solely on the question whether his statements were voluntary and not the result of coercion or intimidation. *Commonwealth* v. *Garcia*, 379 Mass. 422, 428-430 (1980). See *Commonwealth* v. *Freeman*, 430 Mass. 111, 114-115 (1999), and cases cited.

The test for voluntariness is "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." *Com-*

*monwealth* v. *Souza*, 428 Mass. 478, 483-484 (1998), quoting *Commonwealth* v. *Raymond*, 424 Mass. 382, 395 (1997). Factors relevant to the totality of the circumstances include whether promises or other inducements were made to the defendant by the police, as well as the defendant's age, education, and intelligence; experience with the criminal justice system; and his physical and mental condition, including whether the defendant was under the influence of drugs or alcohol. *Commonwealth* v. *Scott*, 430 Mass. 351, 355 (1999). The Commonwealth bears the burden of proving, beyond a reasonable doubt, that the defendant's statements were made voluntarily. *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000). We generally accept the judge's subsidiary findings of fact and afford substantial deference to the judge's ultimate findings. *Commonwealth* v. *Novo*, 442 Mass. 262, 266 (2004), quoting *Commonwealth* v. *Raymond, supra* at 395. In this case, however, the judge's findings are based almost exclusively on the two videotapes of the defendant's interviews at the Somerset police station. Thus, "we are in the same position as the [motion] judge in reviewing the videotape," and need not accord such deference. *Commonwealth* v. *Novo, supra,* quoting *Commonwealth* v. *Prater*, 420 Mass. 569, 578 n.7 (1995).

Based on our review of the October 20 interrogation, we agree with the judge that the Commonwealth has met its burden of proving that the defendant's statements were voluntary. Although the officers used a variety of interrogation techniques this court has found improper — see, e.g., *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 435-436 (2004) (minimization of crimes and suggestions of leniency); *Commonwealth* v. *Novo, supra* at 267-270 (informing defendant that this was his only opportunity to explain); *Commonwealth* v. *Magee*, 423 Mass. 381, 388 (1996) (psychological coercion) — the use of such tactics alone does not render statements made by the defendant involuntary. Rather, the relevant focus is on whether the defendant's will was overborne.[27] Here, the incriminating statements made by the defendant were not tied to or otherwise made in

---

[27]See *Commonwealth* v. *O'Brian*, 445 Mass. 720, 726-728 (2006) (minimizing crime implies leniency, but minimizing crime alone does not render defendant's statement involuntary; defendant's confession voluntary despite officer's statement to defendant's father that defendant "may see the light of day down the road" and further statement that maybe "the shooting was an

response to the pressure tactics employed by the officers. For example, during the initial part of the interview, before the defendant was told that the victim had died and before the officers engaged in any pressure tactics, the defendant acknowledged he was frustrated by the fact that the victim had urinated and that the defendant had yelled at the victim and told him that "this is disgusting." Moreover, the defendant's admissions that he kicked the victim on prior occasions and that he slapped Bowden the day before the victim's death[28] were made throughout the October 20 interview, not only when the officers used questionable or improper tactics designed to elicit confessions.

We agree with the judge that the totality of circumstances demonstrate that the defendant's will was not overborne.[29] Our review of the videotape indicates that the defendant consistently had control over both his actions and mental faculties. He was sober, alert, oriented, and lucid. Cf. *Magee, supra* at 386-388 (officers questioned defendant for seven hours while defendant, in exhausted state, cried and shook uncontrollably; statements involuntary). The defendant does not argue that he was in any way incapacitated or incompetent, and although he became emotionally upset when the officers informed him that the victim had died, that itself does not render his statements involuntary. *Commonwealth* v. *Look*, 379 Mass. 893, 906-907 (1980). Further, rather than acting in a manner that would suggest he was at the mercy of the interrogating officers, the defendant's actions reveal that he was able to decide what to tell the officers and could

accident"); *Commonwealth* v. *Ortiz*, 435 Mass. 569, 577-578 (2002) (officer's statement that it would benefit defendant to tell truth because confession could reduce charge did not constitute police coercion so as to render defendant's statement involuntary).

[28]See discussion of this evidence concerning Bowden in Part 2.e, *infra*.

[29]The judge stated that the defendant was able to "intelligently decide what he should admit," and that the defendant "never confessed." The defendant argues that these statements reflect that the judge drew an invalid distinction between admissions and confessions, and incorrectly decided that because the defendant did not actually "confess" to killing the victim, his statements must have been voluntary. We read the decision differently. We understand the judge to be stating that the defendant's admission to some acts while repeatedly denying that he killed or hurt the victim, in the face of relentless and aggressive pressure to do so by the police, indicated that he had the cognitive awareness and ability to decide what facts and circumstances to admit to and that, ultimately, his will was not overborne.

further identify the officers' tactics for what they were.[30] In sum, based on a consideration of the totality of the circumstances and a full review of the record, in particular the videotape of the interrogation, we conclude that while the police used improper interrogation tactics, the defendant's statements to the police on October 20 were voluntary.

d. *Other issues.* We consider certain additional issues that may arise at the defendant's retrial.

i. *Testimony regarding blood on defendant's hands.* The defendant argues that it was error for the trial judge to permit the Commonwealth to call a forensic chemist to testify that on the evening of October 20, 2003, the defendant's hands tested positive for the presence of blood, because its likely prejudicial effect outweighed its probative value. According to the defendant, such testimony had little, if any, probative value because the test did not indicate whether the blood on the defendant's hands was the victim's blood or even whether it was human blood. At the same time, he claims, the evidence was highly prejudicial because it increased the likelihood that the jury would conclude he killed the victim. There was no error.

This court previously has allowed the introduction of test results for occult blood, see *Commonwealth* v. *Mathews*, 450 Mass. 858, 863 n.7 (2008), and cases cited, and to the extent that the blood test at issue did not reveal the origin, age, or identity of the blood, the defendant was free to explore these issues during cross-examination of the forensic chemist. *Commonwealth* v. *Gonzalez*, 443 Mass. 799, 810 (2005). Therefore, the judge acted within his discretion in permitting the testimony. See, e.g., *Commonwealth* v. *Lewin (No. 2)*, 407 Mass. 629, 631 (1990).

ii. *Jury instruction on reasonable provocation.* The defendant argues that the judge erred in failing to instruct the jury that in

---

[30]For example, the defendant told the officers, "That's your job. That's what you try to do. I'm not stupid; okay? Don't play me like an idiot. I know what's going on." The defendant also stated, "You don't see that because you're a detective, and that's what you're paid to make people do . . . get nervous and lie and fuck them all up. . . . I know your fucking job." He later continued, "[Y]our little job [is] to make [it] sound like I'm the baddest person, that I hurt this kid, and your detective work is going to make me confobble [*sic*] my fucking story, so I say that I did it. . . . It's not going to work, because I didn't hurt that kid."

order to find the defendant guilty of murder in the first or second degree, they first had to find the Commonwealth had proved an absence of provocation beyond a reasonable doubt.[31] Such an instruction was required, according to the defendant, because the Commonwealth had presented evidence to the jury that the defendant had killed the victim because he was angry that the victim had urinated on his leg. An instruction on reasonable provocation is necessary only if the evidence, taken in the light most favorable to the defendant, would support a conviction of voluntary manslaughter based on reasonable provocation. See *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998). The evidence here suggests that a four year old boy urinated on the adult defendant's leg; while the defendant may have found this behavior frustrating or annoying, it did not rise to the level of "adequate provocation" within the meaning of our law, and no rational jury could have found otherwise. See *Commonwealth* v. *Vatcher*, 438 Mass. 584, 589-590 (2003). It was error for the judge to include an instruction on voluntary manslaughter at all, but this was not an error that prejudiced the defendant.

e. *Review under G. L. c. 278, § 33E.* In addition to considering the defendant's specific claims on appeal, we have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E. That review reveals three additional errors. First, the Commonwealth introduced evidence, primarily through the testimony of Bowden, that the defendant had on previous occasions pushed Bowden onto the bed when the two would argue and she would attempt to leave, and further that on the night before the victim's death, the defendant slapped Bowden across the face, leaving a red mark. Generally, prior crimes, wrongs, or acts of the defendant are inadmissible if offered solely to establish criminal disposition or bad character. Mass. G. Evid. § 404 (b) (2010); *Commonwealth* v. *Bonds*, 445 Mass. 821, 833-835 (2006). To be

---

[31]The apparent context of this argument is the following. The judge instructed the jury on both voluntary and involuntary manslaughter as lesser included offenses of murder. Our Model Jury Instructions on Homicide counsel that when a voluntary manslaughter instruction is provided as a lesser included offense of murder, the jury should be instructed that in order to prove the defendant acted with malice necessary for murder, the Commonwealth must establish beyond a reasonable doubt the absence of mitigating circumstances, including heat of passion on reasonable provocation. See Model Jury Instructions on Homicide 27 (1999). The judge did not include such an instruction in this case.

admissible, such evidence must be relevant to "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, nature of relationship, or absence of mistake or accident," Mass. G. Evid., *supra*, and the probative value of the prior act must not be "substantially outweighed by its prejudicial effect." *Commonwealth* v. *Bonds, supra* at 834. Here, it appears that the defendant's prior acts of misconduct against Bowden do not fit within any one of these categories. To the extent the Commonwealth might argue that the evidence was relevant to show the nature of "the relationship," in this case the relevant relationship was between the defendant and victim, not the defendant and Bowden. This evidence should not have been admitted.[32]

Second, the defendant called as a witness Diane Costa, the mother of his two young children. During direct examination, defense counsel questioned Costa about an incident in 2004 when she was asked to bring her son Devon (the defendant is Devon's father) to the Department of Social Services for an interview. The witness testified that she was asked about her relationship with the defendant and whether the defendant had ever hit or otherwise abused Devon; she responded in the negative. During cross-examination, in an apparent effort to establish why Costa and Devon were called to that 2004 meeting, the Commonwealth elicited testimony concerning allegations that Devon had put his penis into the mouth of Costa's goddaughter.

The relevance of this testimony appears to be virtually non-existent, see Mass. G. Evid. at §§ 401, 402, and it is highly prejudicial, Mass. G. Evid. at § 403. Specific testimony concerning the allegations that may have led to the 2004 meeting between Costa, Devon, and the Department of Social Services should not be admitted at a retrial.

Third, on several occasions throughout the trial, the Commonwealth questioned its expert witnesses concerning facts or data that were not otherwise admitted in evidence. As we have discussed, while an expert may base his or her opinion on facts or data not in evidence — assuming the facts and data are otherwise admissible and are a permissible basis for an expert

---

[32]At the defendant's retrial, if either party seeks to introduce all or portions of the defendant's two police interviews, those segments of the videotape that show the defendant admitting to either of these acts against Bowden should be redacted.

to consider in formulating an opinion, see *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531 (1986) — the expert may not on direct examination detail the specifics of that background material. See, e.g., *Commonwealth* v. *Markvart*, 437 Mass. 331, 338 (2002); *Commonwealth* v. *Jaime*, 433 Mass. 575, 577-578 (2001). At retrial, the autopsy photographs and the victim's hospital records must be properly admitted before Dr. Flomenbaum, Dr. Goldberg, or any other expert testifies to their contents.

3. *Conclusion.* The convictions are reversed, the verdicts set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*