COMMONWEALTH vs. ANTHONY P. BAYE.

Hampshire. November 9, 2011. - May 21, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Constitutional Law,* Admissions and confessions, Voluntariness of statement,
    Waiver of constitutional rights. *Practice, Criminal,* Admissions and confes-
    sions, Voluntariness of statement, Waiver. *Waiver. Evidence,* Admissions
    and confessions, Voluntariness of statement.

This court vacated a Superior Court judge's denial of the criminal defendant's
    pretrial motion to suppress statements he made to State police troopers,
    where, although the record did not permit this court to resolve the issue
    whether the defendant was in custody, such that the defendant's statements
    were obtained in violation of his constitutional right to counsel [252-255],
    the statements should have been suppressed as involuntary, given that the
    Commonwealth failed to show that multiple improprieties employed by the
    troopers did not overwhelm the defendant's ability rationally to consider
    whether to make the incriminating statements [255-265].

INDICTMENTS found and returned in the Superior Court Depart-
ment on February 23, 2010.

A pretrial motion to suppress evidence was heard by *Con-
stance M. Sweeney*, J.

An application for leave to file an interlocutory appeal was
allowed by *Gants*, J., in the Supreme Judicial Court for the
county of Suffolk.

*David P. Hoose (Thomas Lesser* with him) for the defendant.

*Brett J. Vottero*, Special Assistant District Attorney (*Thomas
H. Townsend & Matthew D. Thomas*, Assistant District Attor-
neys, with him) for the Commonwealth.

LENK, J. The defendant stands indicted on multiple felony
counts arising out of a series of arson fires. A judge in the
Superior Court denied the defendant's motion to suppress certain
incriminatory statements he made in the course of nearly ten
hours of police interrogation, and a single justice of this court
allowed his subsequent application for interlocutory review. The

defendant contends that these statements were obtained in violation of his right to counsel under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. He contends further that certain tactics employed by his interrogators were sufficiently misleading and coercive so as to render his statements involuntary. For the reasons set forth below, we conclude that the statements should have been suppressed.

1. *Background.* We recite the facts as found by the motion judge, supplemented by certain undisputed facts and by our own viewing of a video recording of the interrogation. See *Commonwealth* v. *Novo,* 442 Mass. 262, 266 (2004).

Between 2 A.M. and 3:15 A.M. on December 27, 2009, Northampton suffered a series of fifteen fires concentrated around the city's third ward, a largely residential area. The fires provoked an emergency that the motion judge described as "severe and unprecedented," requiring the activation of regional emergency plans and overwhelming the capabilities of Northampton's emergency dispatch center. The most severe of the fires killed two men, a father and son, who were inside their home on Fair Street when it burned to the ground. The defendant had two interactions with police officers in the vicinity of the fires, both between 3:20 A.M. and 3:30 A.M. that morning. The defendant or his automobile were also observed by other police officers at or near the scene of certain fires as they were being extinguished. As a result, the defendant quickly became a target of the investigation.

The defendant met with police officers three times in the days following the fires, each time at the Northampton police station. He made the challenged statements during the last of these interviews, on January 4, 2010. This interview consisted of a ten-hour interrogation, during which the defendant admitted responsibility for several of the fires, and which terminated in the defendant's arrest. The interrogation was recorded in its near entirety,[1] and the recording was played at the evidentiary hearing on the defendant's motion to suppress.

The January 4 interrogation was conducted by two experienced

---

[1]Portions of the interview, which were conducted outside the police station, were recorded on audiotape only. The remainder was video recorded.

State troopers, Michael Mazza and Paul Zipper.[2] It began at 10:12 A.M. and was terminated when a third police officer informed the defendant at 8:06 P.M. that he was "now . . . under arrest."

At the beginning of the interrogation, Mazza informed the defendant that he was "not under arrest," pointing him to the door should he wish to leave. Mazza then read the defendant the Miranda warnings. After a few minutes of casual conversation, Mazza began to ask the defendant about his activities on the night of the fires. These questions were initially informal and guided by the defendant's answers. However, once the troopers had elicited the defendant's account of the night, the atmosphere of the interrogation changed markedly.

Mazza informed the defendant that he had photographic evidence that contradicted the defendant's account.[3] Speaking in hushed tones, leaning close into the defendant — who had been seated against a wall — and frequently touching the defendant's arm and back, Mazza then began an hour-long near monologue. Mazza likened his view of the defendant's conduct to the sort of mischief, pranking and "tomfoolery" that could take place on "cabbage night."[4] He repeatedly characterized the deaths and damage caused by the fires as an unplanned "accident," fueled by alcohol rather than by an intent to do harm.

Further, Mazza stated at multiple points prior to the lunch break that the defendant's involvement in the fires had been "conclusively determined." Once the defendant realized the "fabulous case" that had been built against him, Mazza maintained, the defendant would recognize that Mazza was "the only person that could help [the defendant] help himself."

---

[2]Michael Mazza was then a twenty-five year veteran of the State police who specialized in fire investigation. Paul Zipper was a State police sergeant and training supervisor.

[3]The troopers mistakenly represented that one of the photographs shown to the defendant pictured his vehicle at the scene of a fire. Mazza also told the defendant, incorrectly, that the photograph had been enhanced to depict certain numbers from the defendant's registration plate. The defendant does not contest that the officers believed in good faith that the depicted vehicle was the defendant's. Although Mazza emphasized the importance of this photograph, he pointed also to multiple other inconsistencies in the defendant's account.

[4]"Cabbage night" refers to the night before Halloween and is often associated with pranking and minor vandalism. See Alan Metcalf, How We Talk: American Regional English Today 85 (2000).

By Mazza's account, his usefulness to the defendant derived from the weight his opinions carried with prosecutors. Mazza told the defendant that during his more than twenty years in law enforcement, many of them as a fire investigator, district attorneys had uniformly followed his charging recommendations, with only one exception.[5] He suggested that the defendant would "never . . . again" get the opportunity to be treated as "somebody [acting] in a pranking, mischievous manner" rather than "a guy who goes to a fire with ten gallons of gas."[6] If the defendant remained silent, it could be "catastrophic for [him]."

The defendant remained largely stoic and silent through the first hour of Mazza's entreaties. Nevertheless, forty-five minutes into his monologue, at about 12:15 P.M., Mazza began attributing motions of assent to the defendant, telling him that he was "shaking [his] head yes." When Mazza then asked the defendant to agree verbally to Mazza's statements, the defendant responded: "Nope. If I'm being accused of anything, I want to talk to a lawyer."

The troopers did not then cease their questioning. Rather, they informed the defendant that while he had the right to speak to a lawyer, if he would instead just talk to them without counsel, "[W]e can clear this up." Mazza told the defendant that he "still believe[d] that [he was] the kind of guy that meant just not to do" any harm by setting the fires, and almost begged the defendant to "please, please" agree to a continuation of the interrogation.

The defendant responded that he would "still wanna talk to a

[5]The troopers did clarify to the defendant that they did not have a "crystal ball," and simply worked for the "people that make decisions." However, the strongest of these warnings came only toward the end of the interview, when the defendant had already made multiple incriminatory statements. Further, these occasional words of caution were undercut by statements suggesting that a confession would be seen by the district attorney as highly corroborative of the defendant's lack of intent to cause harm.

[6]The troopers emphasized also that an admission would help the defendant's standing in the community, and with his friends. Mazza referred repeatedly to press coverage portraying the arsonist as a "skinhead" or "terrorist." He stated that the defendant's admission could help convince the world that "it wasn't what society thought." More prominent, however, was their repeated insistence that if the defendant confessed, he could escape serious legal consequence.

lawyer, just so I'm not accused of something." Zipper told him, "we haven't accused you of anything." Mazza concurred, telling the defendant that if the defendant only wanted a lawyer "if we're gonna accuse you of this," then he need not get a lawyer at that time. In Mazza's words, the troopers would "acquiesce to anything" if the defendant would speak to the troopers without a lawyer, because it would allow them to "work something on this case" that would ensure not only that the case would be put to rest, but, as Zipper put it, that the fires would not "jam [the defendant's] life up."

Although the defendant again responded with skepticism, he eventually agreed to speak with the troopers if they would not "accuse [him] or charge [him] with these things." The defendant reaffirmed this sentiment after a brief cigarette break. Within moments, the defendant agreed with Mazza that, contrary to his earlier accounts of his whereabouts on the night in question, he had not watched a movie at his friend's house, and that his vehicle had been seen in a location near the fires. Shortly thereafter, he responded to Zipper's question, "What assurances do I get from you that you are not gonna start another fire?" by saying, "Well, I won't," and then, "It's just not gonna happen." Approximately one-half hour after requesting counsel and receiving assurances that he did not need counsel, at 12:53 P.M., the defendant acknowledged that his alibi was false.

After obtaining this admission, Mazza embarked on a second soliloquy, this one lasting approximately one and one-half hours. Early in this second monologue, Mazza represented to the defendant, contrary to Massachusetts law, that the deaths caused by the arson would not qualify as murders if the defendant had not acted "with the intention of killing anybody."[7] Shortly thereafter, he reiterated that there were "exceptions in the [murder] laws when there are deaths caused by accident[]." Mazza then explained that, with the defendant's help, he could "show . . . conclusively" that the deaths in the Fair Street fire had been accidental. After a further forty minutes spent elaborating his view of the deaths and damage caused by the fires as having been accidental, Mazza embarked on a series of insistent pleas

---

[7]Intent to kill is not an element of the crime of felony-murder. See *Commonwealth* v. *Bell*, 460 Mass. 294, 308 (2011).

that the defendant confirm that he had not intended serious harm. The defendant finally responded to a question on whether he "ever wanted to hurt anybody" by saying, "Not really." He clarified, "I never want to hurt anybody." He was then asked, repeatedly, if he had intended to hurt anyone in the fatal fire:

> MAZZA: "It was an accident. Wasn't it? It was, yes? Say yes."
>
> DEFENDANT: "Yes."
>
> MAZZA: "You lit a fire that was more than likely intended on being a small fire. Am I correct? Yes or no? Yes or no?"
>
> DEFENDANT: "Yes."

Following these admissions, Mazza and Zipper took the defendant out to lunch at a local restaurant; conversation there was largely unrelated to the case.

Questioning resumed later in the afternoon. Although the postlunch session included a drive around each of the arson sites, it otherwise mirrored the prelunch session in theme and tenor. During the after lunch questioning, the defendant initially reasserted his noninvolvement in the fatal fire, and denied involvement in the most serious of the house fires. However, the defendant admitted to setting several smaller fires. The troopers told him repeatedly that admitting to some of the fires but not others was simply not credible. By refusing to admit involvement in the more serious fires, they claimed, the defendant was not being sufficiently cooperative to "get . . . credit" with the district attorney.

This line of questioning, in combination with the repetition of the troopers' prelunch themes, succeeded in eliciting several further admissions. Notably, the defendant placed his initials next to a map showing the location of the fatal Fair Street fire, and signed his name to a rudimentary diagram of the location within the Fair Street house at which the fire had been set.

2. *Discussion.* The defendant's challenge to the admissibility of the statements he made in the course of the January 4 interrogation encompasses two interrelated arguments: First, he

contends that by stating at 12:15 P.M. that he "want[ed] to talk to a lawyer" he invoked his Fifth Amendment right to counsel. See *Miranda* v. *Arizona*, 384 U.S. 436, 474 (1966) (*Miranda*). He maintains that, because the State troopers nevertheless continued to interrogate him outside the presence of counsel, his statements must be suppressed. See *Commonwealth* v. *Hoyt*, 461 Mass. 143, 150-151 (2011). Second, the defendant contends that the police response to his asserted invocation constituted an explicit assurance of nonprosecution. He argues that such an assurance, particularly in combination with other improper police tactics, rendered his statements involuntary and therefore inadmissible. Cf. *Commonwealth* v. *Tremblay*, 460 Mass. 199, 212 (2011). See generally *Colorado* v. *Connelly*, 479 U.S. 157 (1986).

a. *Right to counsel.* Given certain shortcomings in the record, and because we conclude that the defendant's statements must in any event be suppressed as involuntary, we address but do not resolve the question whether those statements were obtained in violation of the defendant's right to counsel.[8]

*Miranda, supra* at 444, requires that "[p]rior to any questioning, the [suspect] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." The Commonwealth must prove beyond a reasonable doubt that the defendant has made an initial informed waiver of these rights; thereafter, "responsibility for invoking the protections guaranteed by [*Miranda*] and art. 12 rests squarely in the hands of criminal defendants." *Commonwealth* v. *Clarke*, 461 Mass. 336, 342 (2012), quoting *Commonwealth* v. *Collins*, 440 Mass. 475, 479 n.3 (2003). Such a postwaiver invocation must be made in an "unambiguous or unequivocal" manner. *Commonwealth* v. *Obershaw*, 435 Mass. 794, 800 (2002), quoting *Davis* v. *United States*, 512 U.S. 452, 461-462 (1994).

---

[8]Where a defendant has raised issues of both Miranda warnings and voluntariness, we have generally applied the voluntariness test only after concluding that the police complied with their obligations under *Miranda* v. *Arizona*, 384 U.S. 436, 469 (1966) (*Miranda*). See, e.g., *Commonwealth* v. *Tremblay*, 460 Mass. 199, 205-206 (2011); *Commonwealth* v. *O'Brian*, 445 Mass. 720, 724-725, cert. denied, 549 U.S. 898 (2006).

Here, the defendant was given Miranda warnings at the outset of the interrogation; he was not, however, asked to sign a written waiver of the Miranda rights before speaking with the troopers. Assuming that his subsequent decision to speak constituted an initial implied waiver, the defendant thereafter unambiguously expressed his desire to talk with an attorney. Notwithstanding the Commonwealth's contention that the defendant's first statement that he wanted a lawyer "if [he was] being accused of anything" could be considered ambiguous or equivocal, his later statement that he "still [wanted to] talk to a lawyer" could hardly have left the troopers "scratching their heads as to what [the defendant] meant." *Anderson* v. *Terhune*, 516 F.3d 781, 787 (9th Cir.), cert. denied sub nom. *Cate* v. *Anderson*, 555 U.S. 818 (2008). See *Commonwealth* v. *Hoyt*, *supra*.

Nonetheless, "[t]he requirements of [*Miranda*] are not triggered unless the interrogation is custodial."[9] *Commonwealth* v. *Hilton*, 443 Mass. 597, 608 (2005), *S.C.*, 450 Mass. 173 (2007). "The crucial question" in determining whether an interrogation is custodial is whether "a reasonable person in the defendant's position would have believed that he was in custody." *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996), and cases cited. Here, whether the defendant was in custody when he invoked his right to counsel is an exceptionally close question.

At the beginning of the interrogation, the troopers explicitly advised the defendant that he was free to leave. See *Commonwealth* v. *Groome*, 435 Mass. 201, 215 (2001) (officer's statement that defendant was "free to leave" dispelled any "mistaken impression" that defendant was in custody). However, such an admonishment is not dispositive, and "a previously noncustodial setting can become custodial," *Commonwealth* v. *Hilton*, *supra* at 611-612, as this one at some point assuredly did.

Indeed, by the time of the defendant's invocation, many of the factors we have looked to in determining whether a suspect

---

[9]In the context of a custodial interrogation, a suspect who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication." *Edwards* v. *Arizona*, 451 U.S. 477, 484-485 (1981). See *Commonwealth* v. *Rankins*, 429 Mass. 470, 473 (1999).

is in custody were present. See generally *Commonwealth* v. *Groome, supra* at 211-212 (listing four factors indicative of custody). The defendant had undergone two full hours of questioning in a windowless interrogation room of a police station. See *id.* (location of interrogation). Further, he had repeatedly been told of the troopers' "conclusive[]" opinion that he was involved in a series of fires that had caused two deaths. See *id.* at 212 (tone of interrogation and awareness of status as suspect). In these circumstances, it would not have been unreasonable for the defendant to have discounted the troopers' earlier assurance that he was free to leave.

Yet it is also not implausible to think that "[a] reasonable person in the defendant's position may have believed, based on prior interviews, that he was a suspect . . . [but also] that he was free to terminate the interview." *Commonwealth* v. *Conkey,* 430 Mass. 139, 144 (1999), *S.C.,* 443 Mass. 60 (2004). The defendant had twice previously been interrogated at the same police station without having been subsequently detained. Had these previous interrogations been similarly accusatory, the defendant might not have inferred that he was under arrest from the mere fact that he was again being interrogated.

However, the record contains only passing references to those prior interviews.[10] The motion judge did not view videotapes of those interviews and there was scant information before her as to the length of the interviews, their content, or their participants.

---

[10]At one point during the interrogation, Zipper stated that the troopers felt "terrible [for] the way you were initially treated . . . by those other two guys." At another point, Mazza said, "I'm gonna suggest to you that those two other knuckleheads that talked to you and . . . started yelling at you right when you came in here, they don't give a shit about you." These statements were made in the course of the troopers' efforts to convince the defendant that, while the remainder of the investigatory team "could care less [about him]," Mazza and Zipper "genuinely believe[d]" that he had not intended to hurt anyone and were therefore willing to help him in exchange for his cooperation. There was also some indication that Mazza and Zipper had not been "prepared to talk" to the defendant prior to the previous interviews, and were "more prepared" for the January 4, 2010, interrogation. While suggesting that the defendant had been treated harshly during the two prior interrogations, nothing in the record indicates whether his previous interrogators had, like Mazza and Zipper, communicated to the defendant that they had "conclusively determined" his guilt, or even that they were aware of specific facts rebutting his alibi and implicating him in the fires.

There was thus little basis on which the judge could assess and make a finding whether the defendant should already reasonably have known from the two prior interviews that he was a prime suspect in the fires even before the troopers made that plain on January 4.

"[O]ur review of the record suggests that it would be unwise to resolve [the issue of the defendant's custodial status] without the benefit of such findings." *United States* v. *Lall*, 607 F.3d 1277, 1284, 1287-1288 (11th Cir. 2010). Indeed, the tone and content of the defendant's prior interrogations are critical to a determination whether, at the time the defendant indicated he wanted a lawyer, he reasonably would have believed the landscape had altered such that he was in custody. Nonetheless, a remand for further fact finding on the custody issue is "unnecessary because we conclude that [the defendant's] confession is inadmissible for other reasons." *Id.* at 1284-1285.

b. *Voluntariness.* We turn now to "whether [the] defendant's will was overborne by the circumstances surrounding the giving of [his] confession." *Dickerson* v. *United States*, 530 U.S. 428, 434 (2000), quoting *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226 (1973).[11]

i. *Standard of review.* In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error. The weight and credibility to be given oral testimony is for the judge. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and cases cited. However, we review independently the motion judge's application of constitutional

---

[11]Our voluntariness jurisprudence predates the application of the Fifth Amendment right against self-incrimination to the States in *Malloy* v. *Hogan*, 378 U.S. 1 (1964). See, e.g., *Commonwealth* v. *Taylor*, 5 Cush. 605, 610 (1850). However, our early decisions follow from the same common-law principles on which the United States Supreme Court relied in developing its Fifth Amendment voluntariness jurisprudence. See generally *Dickerson* v. *United States*, 430 U.S. 428, 433 (2000) (citing multiple Eighteenth Century English cases). The Court has since "changed [its] focus" to the issues surrounding *Miranda*. See *id.* at 434. However, it has "never abandoned" its pre-*Miranda* voluntariness jurisprudence, which remains binding Federal law. *Id.* Our cases remain broadly consistent with United States Supreme Court precedent on the voluntariness of statements made to State actors, except that we require the Commonwealth to meet a heightened burden of proof in demonstrating voluntariness.

principles to the facts found. *Commonwealth* v. *Contos*, 435 Mass. 19, 32 (2001).

ii. *Applicable law.* In *Commonwealth* v. *Meehan*, 377 Mass. 552, 563 (1979), cert. dismissed, 445 U.S. 39 (1980), we reasserted the long-standing principle that, where the Commonwealth intends to rely on a defendant's confession to a crime, it must bear the "heavy burden of establishing that [the confession] was voluntary." In meeting this burden, the Commonwealth must prove beyond a reasonable doubt that "in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was [not] overborne," but rather that the statement was "the result of a free and voluntary act." *Commonwealth* v. *Durand*, 457 Mass. 574, 595-596 (2010), quoting *Commonwealth* v. *Souza*, 428 Mass. 478, 483-484 (1998). See *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 435 (2004) (*DiGiambattista*).

Absent some indication that the defendant was particularly vulnerable to suggestion, the focus of our inquiry has been on whether incriminating statements were "the result of coercion or intimidation." *Commonwealth* v. *Durand, supra* at 595. It is the Commonwealth's burden to prove beyond a reasonable doubt, *id.* at 596, that the improper police tactics were not "so manipulative . . . that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess." *United States* v. *Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993), quoting *Miller* v. *Fenton*, 796 F.2d 598, 605 (3d Cir.), cert. denied sub nom. *Miller* v. *Neubert*, 479 U.S. 989 (1986). There is no "bright-line rule[]" that the use of improper interrogation techniques will always result in suppression of a defendant's incriminating statements as involuntary. *Commonwealth* v. *Tremblay*, 460 Mass. 199, 210-211 (2011). Rather, the issue of voluntariness turns on "all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation." *Dickerson* v. *United States, supra* at 434, and cases cited. Isolated improprieties in an otherwise unobjectionable interrogation should not "become[] dispositive, to the exclusion of all else." *Commonwealth* v. *Tremblay, supra* at 211 n.9.

However, the more problematic the details of the interrogation, the more difficult it will be for the Commonwealth to

prove beyond a reasonable doubt that the defendant's will was nevertheless not overborne. See, e.g., *Commonwealth* v. *Novo*, 442 Mass. 262, 269 (2004). In particular, where the police obtain a confession by misrepresenting the defendant's fundamental constitutional rights, it will "be extremely difficult for the Commonwealth" to demonstrate voluntariness "in any case." *Id.*

Here, the troopers employed multiple problematic tactics, many of which they used repeatedly throughout the nearly ten-hour interrogation. The troopers exaggerated the strength of the evidence against the defendant, while simultaneously minimizing the moral and legal gravity of his alleged crimes. See *Di-Giambattista, supra* at 435-440 (reversing order denying suppression of statements obtained in part through minimization and assurances of leniency). They then suggested that if he did not confess then and there, he would be charged with crimes more serious than those of which they thought him guilty. See *Commonwealth* v. *Novo, supra* at 264 & n.2, 267-268 (criticizing pressure to confess "now or never"). They mischaracterized the law of murder, felony-murder, and accident, telling him that he would not be guilty of murder if he had intended the fire as a prank. See *DiGiambattista, supra* at 435 (discussed in part 2.b.iii, *infra*). Finally, when the defendant stated that he wished to consult with an attorney, the troopers dissuaded him from doing so by clearly implying that his statements would not be used to "accuse" him of or "charge" him with any serious felony, but would instead be presented to prosecutors as evidence of his good faith cooperation. Cf. *Commonwealth* v. *Tremblay, supra* at 212 (recognizing that statements may be deemed involuntary if obtained as result of assurances that they would not be used in prosecution).

As explained *infra*, the Commonwealth has failed to show that these multiple improprieties did not overwhelm the defendant's ability rationally to consider whether to make the challenged incriminatory statements. Accordingly, we conclude that the statements should have been suppressed as involuntary.

iii. *Minimization and implied assurance of leniency.* We have long recognized that false "promises . . . as might excite hopes in the mind of the prisoner, that he should be materially benefit-

ted by making disclosures" can undermine a defendant's ability to make an autonomous decision to confess, and are therefore properly regarded as coercive. See *Commonwealth* v. *Taylor*, 5 Cush. 605, 610 (1850). Such promises may be either expressed or implied. Thus, in *DiGiambattista, supra* at 434-436, we held that a motion judge should have suppressed incriminatory statements made after the police repeatedly represented to the defendant that he was being asked to confess to nothing more than an alcohol-induced accident. When combined with other aspects of the interrogation, we concluded that these statements implied to the defendant that he would merely be sent to counselling if he confessed, but that he could face years in prison if he instead required the Commonwealth to bring its "incontrovertible" case to trial. *Id.*

The troopers here used much the same "play book" as did the officers in *DiGiambattista*.[12] Employing nearly identical language as that used by those officers, Mazza and Zipper repeatedly indicated that they realized the defendant "never intended on anybody getting hurt," and that the deaths were "an accident," the result of a "comedy of errors." Mazza indicated that someone like the defendant, who had had a few too many beers and was "doing this in a pranking, mischievous manner, shouldn't be treated the same as a guy who goes to a fire with ten gallons of gas."

In making these statements, the troopers went beyond "suggest[ing] broadly that it would be 'better' for a suspect to tell the truth," or that his regret, cooperation, and lack of intent to do harm "would be brought to the attention of . . . the courts" or the district attorney. See *Commonwealth* v. *Tolan*, 453 Mass. 634, 643 (2009), quoting *Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979). Instead, the defendant was repeatedly assured

---

[12]Several commentators have noted the prevalence of the tactics employed in *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 435 (2004) (*DiGiambattista*), in confessions that were later rebutted by overwhelming forensic evidence. See Garrett, The Substance of False Confessions, 62 Stan. L. Rev. 1051, 1097-1098 (2010); Ives, Preventing False Confessions: Is *Oickle* Up to the Task?, 44 San Diego L. Rev. 477, 486 (2007). For voluntariness purposes, however, the more material problem is that a defendant may be led to believe that he can "choose to speak without consequences, thus denying him any rational choice of whether to waive his rights and confess." *United States* v. *Male Juvenile (95-CR-1074)*, 121 F.3d 34, 41 (2d Cir. 1997).

of the troopers' unparalleled influence with the district attorney, cf. *People* v. *Klinck*, 259 P.3d 489, 492 (Colo. 2011) (improper for officer to say, "it's up to me to decide if I'm gonna file charges"), and of their intent to use such influence in ensuring that the defendant received a second chance, if he confessed that very day.

Contrasted against the troopers' predictions of leniency was the prospect that, unless they could portray the fires as a mistake, an accident, or pranking gone awry, it would be "catastrophic" for the defendant because the district attorney would instead treat him as a "double murder[er]." The troopers suggested to the defendant that the January 4 interrogation was "[his] only opportunity to explain [his] actions," and that, if he failed to speak, he might be denied a bona fide defense. Cf. *Commonwealth* v. *Novo*, 442 Mass. 262, 264 n.2, 267-270 (2004) (criticizing interrogators' " 'now-or-never' theme"). Contrast *Commonwealth* v. *Durand*, 457 Mass. 574, 596-597 & n.27 (2010) (suspect was able to identify officers' tactics minimizing crime for what they were, and to decide what to tell them in light of this understanding). The troopers told the defendant that "the next fifteen minutes of [his] life" would "dictate potentially what the rest of [his] life could be spent doing." If he did not cooperate at that point, "the accident scenario [would] no longer [be] available to [him]."

As we recognized in *DiGiambattista*, "[a] false statement concerning the strength of the Commonwealth's case, coupled with an implied promise that the defendant will benefit if he makes a confession, may undermine 'the defendant's ability to make a free choice.' " *DiGiambattista*, *supra* at 435, quoting *Commonwealth* v. *Scoggins*, 439 Mass. 571, 576 (2003). An innocent defendant, confronted nonetheless with "apparently irrefutable . . . evidence of his guilt, might rationally conclude that he was about to be convicted wrongfully and give a false confession in an effort to salvage the situation." *DiGiambattista*, *supra*, quoting *Commonwealth* v. *Scoggins*, *supra* at 576-577. Such a choice is particularly likely where, as here, a defendant has been dissuaded from seeking the assistance of counsel. See *Miranda*, *supra* at 465-467 (discussing "presence of counsel" as "protective device" necessary to permit defendant

to make considered, "free and rational choice" whether to confess).

iv. *Assistance of counsel and consequences of self-incrimination.* "It is only through an awareness of [the potential] consequences [of self-incrimination] that there can be any assurance of real understanding and intelligent exercise of [a defendant's] privilege" to remain silent, and to consult with an attorney prior to deciding whether to confess to a crime. *Miranda, supra* at 469. Accordingly, "[a]n officer cannot read the defendant his Miranda warnings and then turn around and tell him that despite those warnings, what the defendant tells the officer will" not be used against the defendant. *Hopkins* v. *Cockrell,* 325 F.3d 579, 585 (5th Cir.), cert. denied sub nom. *Hopkins* v. *Dretke,* 540 U.S. 968 (2003). See *State* v. *Dodge,* 17 A.3d 128, 133 (Me. 2011), citing *United States* v. *Walton,* 10 F.3d 1024, 1027 (3d Cir. 1993) ("false police assurance of confidentiality in a noncustodial setting may result in suppression if not promptly remedied"). Such assurances render a defendant's resulting statements involuntary where they cause him to "believe[] that his [statements will] not be used against him, and, therefore, [that] he [is] free to say whatever he want[s]" without consequence. *Commonwealth* v. *Tremblay,* 460 Mass. 199, 210 (2011).

Here, before making any inculpatory statements, the defendant unambiguously expressed his desire to speak to a lawyer. See part 2.a, *supra.* Understanding that the defendant would consult an attorney if he thought that the troopers would "accuse or charge [him]," the troopers told him that they would not do so. Knowing also that they had warned the defendant at the outset, consistent with *Miranda,* that anything he said to them could be used against him, the troopers undermined their prior admonition by agreeing that his statements would not be used as the basis of an accusation or a charge. See *Hopkins* v. *Cockrell, supra.* When the troopers resumed their questioning, they did so on the explicit understanding that, in Mazza's words, "if we were to accuse you, then . . . you would want a lawyer."

The troopers' attempt to dissuade the defendant from seeking legal advice by suggesting to him that his statements would not be used to "accuse" him were doubtless rendered more plausible

by their suggestion that the crimes they were investigating were not as serious at the defendant might have thought. Just one-half hour after the defendant's invocation, the troopers represented to him that unintentional felony-murder is not in fact murder, and that arson only merits serious sanction when perpetrated with malicious intent.[13] Cf. *People* v. *Esqueda*, 17 Cal. App. 4th 1450, 1486 (1993) (among other improper tactics, police "clearly suggested . . . [defendant] would avoid the more serious charge by [making an] admission"; *People* v. *Freeman*, 668 P.2d 1371, 1379 (Colo. 1983) (suppressing statements where, inter alia, officers told suspect "he would receive the same punishment regardless of the number of offenses" he admitted). The clear import of these statements, taken together with the troopers' prior assurances that the defendant did not need a lawyer, was to communicate to the defendant that he could only benefit from speaking with the police and thereby to "mislead[] [him] concerning the consequences of relinquishing his right to remain silent." *United States* v. *Lall*, 607 F.3d 1277, 1283 (11th Cir. 2010), quoting *Hart* v. *Attorney Gen. of Fla.*, 323 F.3d 884, 894 (11th Cir.), cert. denied sub nom. *Crist* v. *Hart*, 540 U.S. 1069 (2003).

v. *Effect on the defendant.* "Where, as here," the defendant produces evidence of coercion in the course of an interrogation, "the Commonwealth must . . . prove beyond a reasonable doubt that the [defendant's] statement was [nonetheless] voluntary." *Commonwealth* v. *Hilton*, 450 Mass. 173, 177 (2007). In concluding that the Commonwealth had met this burden, the motion judge placed considerable emphasis on the defendant's personal characteristics, such as his intelligence,[14] and his calm demeanor during the interrogation. As to the latter, the defendant could

---

[13]As noted above, Mazza stated, "There are exceptions in the laws when there are deaths caused by accidents . . . and if that's the case, they need to be able to recognize it and handle it as such." Later, he implicitly contrasted the criminal consequences of a situation where an arsonist intends to create a large-scale fire "without a care in the world . . . if [others] die" and a situation in which a smaller fire unexpectedly got out of hand.

[14]The defendant, who was twenty-five years old at the time of the interrogation, had no criminal background, lived alone in an apartment in his parents' house, worked as a cook, was pursuing an associate's degree, and had both an active social life and a girl friend. We note, too, that the troopers did not raise their voices or use physical restraints, that during breaks in questioning they

fairly be described as "sober, alert, oriented and lucid," *Commonwealth* v. *Durand*, 457 Mass. 574, 597 (2010), and the record does not suggest that he was in the fragile state displayed by defendants in certain of the cases where we have found confessions involuntary. See, e.g., *Commonwealth* v. *Meehan*, 377 Mass. 552, 565-566 (1979) (evidence that defendant was in withdrawal from drug and alcohol intoxication). While such factors are pertinent considerations when assessing whether, in the totality of the circumstances, the defendant's will was overborne, *Commonwealth* v. *Tremblay*, *supra* at 207, their significance is context dependent and diminishes with the severity of the police misconduct at issue here. See *Commonwealth* v. *Novo*, 442 Mass. 262, 269 (2004).

Unlike psychological coercion of the sort discussed in *Commonwealth* v. *Durand*, *supra* at 594-595, 597, police assurances that a suspect's statement will not be used against him or her do not rely upon a defendant's compromised or confused mental state. Instead, they prevent even those defendants otherwise capable of rational decision-making from applying their "rational intellect," *Commonwealth* v. *Selby*, 420 Mass. 656, 662 (1995), to "weigh the pros and cons of confessing." *United States* v. *Rutledge*, 900 F.2d 1127, 1129 (7th Cir.), cert. denied, 498 U.S. 875 (1990). They thereby "ma[ke] it impossible" for even a calm and relatively sophisticated defendant "to make a *rational* choice as to whether to confess" or whether instead to exercise his or her right against self-incrimination (emphasis in original). *Id.* For this reason, assurances that a suspect's statements will not be used to prosecute him will often be "sufficiently coercive to render the suspect's subsequent admissions involuntary" even when the suspect shows no outward signs of fear, distress or mental incapacity. See *United States* v. *Lall*, *supra* at 1286. See, e.g., *United States* v. *Walton*, 10 F.3d 1024, 1030-1031 (3d Cir. 1993) (statements suppressed notwithstanding defendant's intelligence and education).

The troopers' reaction to the defendant's invocation of his

---

treated the defendant in a courteous manner, and that they asked the defendant several times whether he wanted a break or refreshments. The troopers appear to have accompanied him on all the breaks taken, such as for cigarettes and lunch.

Fifth Amendment rights is of particular concern here because the defendant's request occurred after he had been read the Miranda rights. We have "encouraged police to give Miranda warnings prior to the point at which an encounter becomes custodial," *Commonwealth* v. *Hilton*, 443 Mass. 597, 610 n.7 (2005), and we do not decide in this case whether the provision of such warnings binds interrogators to honor scrupulously a suspect's invocation of the Miranda rights outside the context of a custodial interrogation. However, where the police provide precustodial warnings but then ignore the defendant's attempts to avail himself of those rights, the "coercive effect of continued interrogation [is] greatly increased because the suspect [could] believe that the police 'promises' to provide the suspect's constitutional rights were untrustworthy, and that the police would continue to" ignore subsequent invocations, rendering such invocations futile. *Tukes* v. *Dugger*, 911 F.2d 508, 516 n.11 (11th Cir. 1990), cert. denied sub nom. *Singletary* v. *Tukes*, 502 U.S. 898 (1991).

Further, there is no indication in the record before us that the defendant disbelieved the troopers' assurances that his statements would not be used against him. Contrast *Commonwealth* v. *Durand, supra* at 598 (defendant was able to "identify the officers' tactics for what they were"). Nor were the troopers' statements made in a context that rendered their import ambiguous. Compare *Commonwealth* v. *Tremblay, supra* at 210-212 (in context, agreement that comment would be "off the record" would have been understood by defendant simply as indicating that it would not be included in his written statement).

Finally, the mere fact that the defendant's most unambiguous inculpatory statements were made only later in the interrogation is not sufficient to satisfy the "extremely difficult" burden that the Commonwealth faces in showing that the defendant's statements were freely made notwithstanding the presence of police coercion. See *Commonwealth* v. *Novo, supra.* In the half-hour after the defendant agreed to continue speaking with the troopers if they would not accuse him or charge him, the defendant became far more engaged in the conversation than he had been in the previous one and one-half hours. It was at the end of this half-hour that the defendant made his first significant admission,

agreeing that he had fabricated his alibi. This admission immediately followed Zipper's assurance that the troopers wanted to "put an end" to the speculation that the fires were more than "tomfoolery" so that they could help the defendant "move on."

The Commonwealth contends that this admission, as well as the defendant's subsequent admissions, resulted not from the troopers' assurances, but rather from the defendant's realization that his alibi was contradicted by substantial evidence. The record is to the contrary. Although by 11:25 A.M. the defendant had been made aware of the inconsistencies in his alibi, such as that his vehicle had been observed during the fires at a time when he said that he was at a friend's house, he did not recant his alibi until 12:53 P.M. This was shortly after he had asked for an attorney and had been persuaded not to speak with one through assurances that his acts did not necessarily amount to arson or murder.

The inference of an essential link between these assurances and the defendant's admissions is heightened by the circumstances of the defendant's second set of admissions. In this set of admissions, the defendant assented to Mazza's contention that the troopers' "theory [was] right" and that the defendant had "lit that fire" at the house in which two lives were lost. These statements immediately followed another round of false assurances that the defendant could avoid "a murder rap" if he could confirm that the fires had been set without homicidal intent.

With these two admissions, "the cat was already out of the bag." See *Commonwealth* v. *Smith*, 412 Mass. 823, 830 (1992), quoting *Darwin* v. *Connecticut*, 391 U.S. 346, 351 (1968) (Harlan, J., concurring in part and dissenting in part). Given his knowledge that he had already once confirmed his involvement in the fatal Fair Street fire, and that he had admitted to fabricating an alibi for the night of the fires, the defendant could quite rationally have believed that his best hope was to cooperate.[15] Thus, the timing of the defendant's statements does not

[15]The defendant did later attempt to recant his statement that he was involved in the fatal Fair Street fire. He was persuaded to make a second admission in part by the troopers pointing out the implausibility of maintaining that he was not involved in the fires, or involved in only some of the fires, even after he

demonstrate beyond a reasonable doubt that the statements were voluntary rather than being the product of the many disfavored tactics employed by the troopers who interrogated the defendant.

3. *Conclusion.* The troopers' minimization of the defendant's crimes, their implied assurances of leniency, and their suggestion that such leniency was a "now or never" proposition reinforced their insistence that, in admitting to involvement in the fires, the defendant would not necessarily be admitting to having committed any serious felonies. These misrepresentations, in combination with the troopers' attempts to persuade the defendant not to obtain the advice of counsel on whether to exercise his right to remain silent, constituted an affirmative interference with the defendant's understanding of his fundamental constitutional rights. On the record before us, the Commonwealth has not shown beyond a reasonable doubt that the defendant's statements were nevertheless freely and voluntarily made. Therefore, the statements the defendant made after he indicated his desire to speak with an attorney must be suppressed.

Accordingly, the motion judge's denial of the defendant's motion to suppress his statements is vacated. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

had admitted to fabricating his alibi. Once the defendant was "in for a penny," they told him, he was "in for a pound."