## COMMONWEALTH vs. JASON ORTIZ.

No. 12-P-456.

Essex. December 7, 2012. - September 20, 2013.

Present: CYPHER, BROWN, & COHEN, JJ.

*Practice, Criminal,* Motion to suppress, Admissions and confessions, Voluntariness of confession. *Constitutional Law,* Admissions and confessions, Voluntariness of statement.

This court concluded that suppression was required of a criminal defendant's statements made during a police interview where it could fairly be said that the the nineteen year old defendant's will was overborne by improper police interrogation tactics that included misrepresenting statements given by witnesses, informing the defendant that the interview was his last chance to tell his story, and making coercive assurances that the defendant could separate himself from the murder or otherwise be less culpable; accordingly, the defendant's subsequent statements could not reasonably be said to have been voluntarily made. [266-271]

INDICTMENTS found and returned in the Superior Court Department on May 28, 2010.

A pretrial motion to suppress evidence was heard by *Gary V. Inge,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Robert J. Cordy,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Ronald DeRosa,* Assistant District Attorney, for the Commonwealth.

*James B. Krasnoo* for the defendant.

COHEN, J. The defendant stands indicted and is awaiting trial on charges of murder in the first degree (G. L. c. 265, § 1), armed robbery (G. L. c. 265, § 17), and carrying a dangerous weapon (G. L. c. 269, § 10), arising from the shooting of Luis Rodriguez at a party in Haverhill. After an evidentiary hearing,

a judge of the Superior Court allowed, in part, the defendant's motion to suppress statements made during an interview with police. Having obtained leave from a single justice of the Supreme Judicial Court, the Commonwealth brings this interlocutory appeal.

Like the motion judge, we conclude that the nineteen year old defendant's will was overborne by improper police interrogation tactics. Those tactics included misrepresenting statements given by witnesses; informing the defendant that the interview was his "last chance" to tell his story; and assuring the defendant, who had been steadfast in denying that he had given the suspected shooter a gun, that he would not be culpable if the defendant had given the shooter the gun for a purpose other than to rob or kill the victim, and the shooter had acted like a "cowboy." However, unlike the motion judge, we further conclude that suppression is required of all statements made once the defendant's will was overborne, and not merely selective statements pertaining to the gun.

1. *Standard of review.* The evidence before the motion judge consisted of the testimony of State Trooper Steven O'Connor at the motion hearing, the video recording of the defendant's interview and a transcript thereof, and transcripts of the interviews of several witnesses who met with the police prior to their meeting with the defendant. All of these items have been transmitted to us. Accordingly, to the extent the judge's decision rests on the testimony at the motion hearing, we determine whether his subsidiary findings were warranted by the evidence, and, if so, accept them; but to the extent the decision is based on the recording and the transcripts submitted in evidence, we independently make judgments with respect to their contents without deference to the judge's findings. *Commonwealth* v. *Novo*, 442 Mass. 262, 266 (2004).

2. *Background.* On Friday, April 16, 2010, Gena Quintana hosted a party at her Haverhill apartment, which was attended by three other women (Stephanie Michaud, Cassie Fournier, and Susan Sullivan) and four men (the defendant, Patrick "Butter" Warren, Everett "Chey" Leonard,[1] and the victim, Luis

---

[1]Leonard also has been indicted in this matter, but is not a party to this

Rodriguez). The party continued into early Saturday morning, when, as the guests began to disperse, gun shots were heard. It later was determined that Rodriguez had been shot in the hallway outside Quintana's apartment; he died at the hospital later that day.

Upon learning of the shooting, the State police and the Haverhill police began an investigation, which included interviewing those present at the party. At some point during the weekend, Trooper O'Connor left a telephone message for the defendant requesting an interview. The message included the comment that O'Connor "knew" that the defendant was not the shooter. The defendant, urged by his ex-girlfriend's mother to get this "squared away," ingested marijuana by smoking "half a blunt," and proceeded by himself to the police station in the late afternoon of Monday, April 19, 2010.

By the time the defendant was interrogated, the police already had conducted multiple interviews of the four female witnesses, and had interviewed Warren once. One witness, Michaud, eventually implicated the defendant and Leonard during her third interview with the police. She told the detectives that Rodriguez, who had just cashed his paycheck, asked for change for two fifty dollar bills while playing cards at the party. She later saw the defendant hand Leonard a gun in the bedroom of Quintana's apartment, at which point Leonard walked out into the hallway where Rodriguez and Warren were smoking. According to Michaud, when Sullivan, who was Leonard's girlfriend, entered the bedroom to say good bye, the defendant told her to stay there; his telephone rang, he walked from the bedroom into the living room, and then walked out the door into the hallway. Some minutes later, Michaud, who remained inside the apartment, heard shots and then saw Rodriguez stumble into the apartment. Michaud first estimated the interval between the defendant's departure and the shots as "three to four minutes," and later said, "probably like two minutes if that."

appeal. His counsel informed the judge at the hearing on the defendant's motion to suppress that he had not filed a motion to suppress statements made to investigators by Leonard because the Commonwealth had agreed that those statements would not be used at trial.

3. *The interview.* The interview with the defendant, which was recorded with the defendant's consent, started at approximately 4:39 P.M. and ended at approximately 7:29 P.M. There was no break, and the defendant was not offered (and did not request) water or the opportunity to use the bathroom.

In addition to O'Connor, Detective Glenn Fogarty of the Haverhill police department interrogated the defendant. Lieutenant Norman Zuk also was present for a time.[2] O'Connor took the lead, and, at times, Fogarty was actively involved; Zuk's participation was very limited.[3] The defendant and the detectives were seated around a small table. Fogarty sat directly across from the defendant, and O'Connor was seated to the defendant's left. Both officers were roughly two to four feet from the defendant, and both were in plain clothes. The defendant was unrestrained until he was arrested at the conclusion of the interview.

O'Connor administered Miranda warnings,[4] and the defendant affirmed his understanding and willingness to speak with the police. The defendant was nineteen years of age. Although he had some prior involvement with law enforcement, there was no evidence that he previously had received Miranda warnings. He had no trouble speaking or understanding English, and did not appear to be suffering from any physical or mental illness or impairment. He was not asked and did not disclose the extent of his education.

About thirty minutes into the interview, the defendant told the detectives that he had gotten "high" on marijuana before coming to the police station but that he had sobered up once he got there. O'Connor testified at the motion hearing that the defendant displayed no adverse effects from the use of marijuana, and the motion judge credited this testimony.

[2]We refer to Fogarty, Zuk, and O'Connor as officers or detectives.

[3]Review of the video recording reveals that the transcript of the interview does not always correctly identify the officer who is speaking. We have relied on the recording in attempting to accurately attribute the officers' questions and comments. However, any mistakes are not material to the issues on appeal.

[4]The motion judge rejected the defendant's contention below that the validity of his Miranda waiver and the voluntariness of his statements were undermined by misstatements in the warnings as recited by O'Connor. The defendant, who did not seek interlocutory review, does not address the issue in this appeal.

The manner of interrogation ranged from conversational and reassuring to aggressive and confrontational. After introductory matters, the defendant was asked to recount what he knew about the shooting. He explained that he had been speaking to Michaud in the bedroom when he decided to leave the party. He made his way to the apartment door, opened it, and shut it behind him, and immediately gunfire went off; for his safety, he ran down the stairs to where his friend Warren already was standing, and the two of them both ran out. A short time later, he went back upstairs to make sure that Quintana was all right and left when she told him she was fine. Later, Quintana called him at home to say that Rodriguez was throwing up all over her back stairs. The defendant went back to her house and spoke with Rodriguez, who was lying on the floor at the foot of the back stairs. Rodriguez was vomiting but said that he was "good," and that he was "just fucked up" (had too much to drink). The defendant and Quintana went back upstairs where she called Rodriguez's "boy" to come and get him. The defendant left and learned only later that Rodriguez had been shot and ultimately died.

O'Connor showed the defendant Leonard's photograph, and the defendant denied knowing him. O'Connor then asked a series of questions concerning whether the defendant had given Leonard a gun at the party, to which the defendant responded that he didn't have a gun, and, if someone at the party said the defendant gave Leonard a gun, that person would be lying. At this point (approximately twenty-five minutes into the interview), the detectives played a portion of the recording of Michaud's third interview where she recounted seeing the defendant hand Leonard a gun in the bedroom. The defendant, whose demeanor was calm and self-assured to this point, began to sweat noticeably and repeatedly pulled up his shirt to mop his face. When later asked about his perspiration, the defendant stated that he felt nervous because the witness was lying about him.

O'Connor then posited an alternative account of the night: Rodriguez had flashed money at the party, Leonard wanted to "roll" him, the defendant gave Leonard a gun, Leonard went outside to rob Rodriguez, the defendant went outside with them, things got out of hand, Leonard "screw[ed] up" and fired shots, and the defendant took off having had no intention of anybody

getting hurt. In response, the defendant vehemently denied discussing any robbery or giving Leonard a gun, and said that Michaud was lying.

As the interview continued, the officers aggressively challenged the defendant's account that he emerged from the apartment just as the shots were fired. O'Connor repeatedly (and falsely) represented to the defendant that, in their interviews, all four women had said that he was out in the hallway for about three minutes before the shots were fired, and both O'Connor and Fogarty falsely claimed that Warren, too, had placed the defendant in the hallway with Leonard and Rodriguez for a few minutes. The defendant appeared angered by these representations. At one point, he accused the officers of "switching shit up, like I'm stupid or something, and I'm not stupid, okay?" When the officers played portions of the interviews of Quintana and Warren, and the recordings did not directly support what the officers had represented, the defendant again emphatically maintained that the shots rang out as soon as he closed the apartment door.

Approximately an hour into the interview, the officers introduced a new theme — that this was the defendant's "last chance" to "distance himself" from the crime by admitting that he was present when Rodriguez was confronted in the hallway. The officers explained that they were not saying that the defendant was the shooter, but that he needed to take this opportunity to explain that he was simply in "the wrong place at the wrong time." Among other things, Zuk stated, "The District Attorney is going to see this. The Judge is going to see this, and ultimately the jury is going to see this, and when they hear you spinning this tale, you're not helping yourself. So, tell the story of what happened out there. If you didn't pull the trigger, now's the chance for you to tell your story." When the defendant replied, "I didn't," Zuk continued, "So, I suggest you tell your story now, because everyone else already told it for you. So you can paint yourself in the best picture you can here, right now, and this is your last chance." In the same vein, O'Connor insisted that the defendant "saw what happened," and had to tell them in his own words "because down the road, everyone else is going to put a picture in. It's not going to look good for you. This

is your chance to say, 'Look, this is what happened. This is how I felt. I didn't want it to happen.' "

At this point, the defendant appeared less self-assured and began to waver in his account. He explained that it "felt like" only two seconds that he was out in the hallway, conceded that he knew Leonard, and eventually admitted that he saw Rodriguez and Leonard fighting before the shots were fired; but he continued to insist that he was not the shooter, and was not involved in any robbery scheme.

Approximately one hour and forty minutes into the interview, the detectives turned again to the subject of the defendant handing Leonard a gun in the bedroom. They repeatedly suggested that even if the defendant had given Leonard the gun, the defendant would not be culpable if he was not the shooter, and Leonard had acted rashly. Fogarty introduced this theme, saying: "If you give [Leonard] a gun, and he goes out and acts like a cowboy, goes out and somebody gets killed, that's not your fault, is it?" When the defendant denied giving Leonard a gun, Fogarty added: "If you give [Leonard] a gun, he goes out and acts like a cowboy and kills somebody. That's not your fault. You didn't pull the trigger, right? . . . I'm asking hypothetically. If you give [Leonard] a gun, and he goes and does something stupid with it, that's not your fault. You didn't go and kill that guy, right?"

When the defendant persisted in denying that he gave Leonard a gun, Fogarty continued: "No. This was hypothetical, OK? If you gave [Leonard] a gun, and [Leonard] does something stupid, OK, that's not your fault that [Leonard] did something stupid, right? Just because somebody died, if you gave [Leonard] a gun that he killed somebody with, it doesn't mean that it's your fault, right?" The defendant then tried to clarify and confirm what was being said to him. He posed a scenario where O'Connor gave the defendant a gun, and the defendant "go[es] acting like a cowboy." "Is that your fault?" asked the defendant, to which O'Connor responded, "If you shoot — no."

O'Connor emphasized that they could prove the defendant gave Leonard the gun, but "what we do know is that you had no intention that he was going to use it to kill somebody, just to

scare someone. . . . We know that, and that's [why] we're trying to get you out of this jam so that no one thinks that you gave him a gun and said, 'Hey man, go kill him and get his money.' You gave him a gun and said, 'Go scare him and get his money.' " O'Connor then added (falsely) that Michaud's statement that the defendant had given Leonard a gun was made under oath, at which point the defendant repeated, "Under oath."

O'Connor and Fogarty continued to stress that there was a distinction between handing over the gun with the intention that Leonard would use it to kill Rodriguez and handing it over with the intention that Leonard would use it only to scare and rob him. O'Connor said, "Right now, and for the judge or jury, it's whether you gave it to him to scare him or kill him." He went on, "There's no other question . . . . It happened. You cannot change that. It happened. But why did it happen? Did you want [Leonard] to kill him or just to scare him? That's where we want to go tonight. That's it. Kill him or scare him? Kill him, you're in this for a capital murder. Scare him, wrong place, wrong time, the cowboy screwed up. That's it."

When the defendant responded that he did not want anyone to get robbed or die, O'Connor offered additional alternative explanations for providing the gun: Leonard "needed it for the next day," he "had a beef with someone," he was "having a problem with this kid down the street — whatever situation it was, I don't know. And you said to [Leonard], 'Man, take this. Take care of yourself. Here's the gun, not to rob anybody, not to shoot anybody at the end of the night, but take this gun for protection,' for whatever he needed it for, OK?" O'Connor continued, "Maybe there was no robbery planned, but you just give it to him for protection, and he gets in a beef." And then later, "Maybe you didn't give it to [Leonard] to rob a guy. Maybe you gave it to him for another reason, for protection. And that's totally different than you give it to him to rob him. That's totally different. . . . We want to know what the reason was you gave it to him, because it happened. If you didn't give it to him to rob him, that's cool. That's fine. . . . There's a reason he wanted that gun. . . . I don't know what it was, and if you can tell me the reason that he wanted it for, you're out of the picture."

As the interview approached the end of its second hour, O'Connor and Fogarty continued to probe insistently why the defendant gave Leonard the gun, and whether it was to rob Rodriguez or for Leonard's protection. The defendant finally said, "No. It was not to rob him," but professed not to know why Leonard needed a gun. O'Connor shouted, "Separate yourself from the murder. Tell us why you gave it to him. Get away from the murder. Get away from it. It's easy to get away from it." The defendant, while also stating that the gun did not belong to him and that he had been holding onto it for Leonard, ultimately admitted that he did hand the gun to Leonard, and that it was "for protection."

As the detectives pressed for details, the defendant backed away from his admission, at one point hanging his head. O'Connor again said, "If you gave it to him for protection that's totally different than you giving him the gun to rob him, but I want to hear this from you. You've got to tell us why. You've got to tell us why." The defendant eventually told the detectives unequivocally that he gave Leonard the gun "[f]or protection for a beef that he had."

The remainder of the interview concerned how the gun was handed off to Leonard and whether it belonged to the defendant. The detectives also encouraged the defendant to assist them in finding the weapon, because "you're going to be whistling 'Dixie' if we can get [Leonard's] fingerprints off of this gun." The officers left the room for a time, during which the defendant was hunched over in his seat and looked exhausted. They returned to ask a few more questions and then placed the defendant under arrest for murder. The defendant reacted with apparent surprise, declaring that the arrest was "bullshit," he was not the one who shot Rodriguez, and the officers "kn[e]w it."

4. *Discussion.* The defendant has the initial burden to produce evidence to show that his statements were involuntary. *Commonwealth* v. *Tremblay*, 460 Mass. 199, 206 (2011). Once the defendant produces such evidence (as the defendant did here by means of his motion, affidavit, and proffer), the Commonwealth bears the heavy burden of establishing that the statements were, in fact, voluntary. *Commonwealth* v. *Baye*, 462 Mass. 246, 256 (2012). In meeting that burden, "the Commonwealth must prove

beyond a reasonable doubt that 'in light of the totality of the circumstances surrounding the making of the statement[s], the will of the defendant was [not] overborne,' but," instead, that the statements were "the result of a free and voluntary act." *Ibid.*, quoting from *Commonwealth* v. *Durand*, 457 Mass. 574, 595-596 (2010).

"[T]he issue of voluntariness turns on 'all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation.' " *Baye, supra*, quoting from *Dickerson* v. *United States*, 530 U.S. 428, 434 (2000). Thus, the use of improper interrogation techniques by the police does not always mandate suppression; "[h]owever, the more problematic the details of the interrogation, the more difficult it will be for the Commonwealth to prove beyond a reasonable doubt that the defendant's will was nevertheless not overborne." *Id.* at 256-257. Here, the Commonwealth has failed to meet that burden.

The defendant was nineteen years old. While he had some prior experience with law enforcement, there is no suggestion that he had been interviewed in this manner previously; there was no evidence, for example, that he ever had received Miranda warnings. Before going to the police station, he smoked marijuana. However, the motion judge found, and we accept, that this "was insufficient to materially affect the voluntariness of the Miranda waiver or, in and of itself, the voluntariness of the subsequent statements made." Although not extreme in its length, the nearly three-hour interview, conducted without a break or a glass of water, was taxing and left the defendant visibly exhausted.

O'Connor and Fogarty undeniably used several interrogation techniques that have been disapproved by our courts. We examine them in the order they were employed, and comment on the defendant's reactions.

a. *False statements.* "[T]he 'use of false information by police during an interrogation is deceptive and is a relevant factor indicating a possibility that the defendant's statements were made involuntarily.' " *Commonwealth* v. *Novo*, 442 Mass. at 267, quoting from *Commonwealth* v. *Selby*, 420 Mass. 656, 664 (1995). While the use of false statements does not automatically render a suspect's confession involuntary, it is strongly disfavored, particularly when coupled with other impermissible

techniques. See *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 434-435 (2004).

From the beginning of the interview, the detectives misrepresented the results of their investigation, contending that all four of the female witnesses and one of the male witnesses (Warren) had squarely placed the defendant in the hallway for a number of minutes before shots were heard. Later, they also informed the defendant, untruthfully, that Michaud had given her statement under oath. It is evident, however, that the defendant was skeptical of the detectives' accounts of the witness interviews, and we do not think they played a significant role in overbearing his will. On the other hand, the detectives' claim that Michaud's interview was under oath, appears to have struck a nerve with the defendant. This claim was made during the period when the detectives were assuring the defendant that, depending on the reason he provided the gun, he could be "out of the picture." We cannot discount it as a contributing factor in bringing about his eventual admissions.

b. *"Last chance" theme.* The detectives' message that this was the defendant's "last chance" to tell his story was a plain misstatement of the defendant's rights to present a defense. See *Commonwealth* v. *Novo*, 442 Mass. at 267-270. By adding that the judge would see the interview statement and that the defendant was not "helping [him]self," Zuk solidified the erroneous impression that what the defendant said at the interview would be dispositive — or at least overwhelmingly important — in assessing his culpability in court.

The "last chance" theme plainly had an impact on the defendant. Compare *Commonwealth* v. *Durand*, 457 Mass. at 596-597. In direct response to these remarks, he finally admitted that he had been in the hallway long enough to have seen Rodriguez and Leonard fighting before shots were fired. Nevertheless, the defendant retained sufficient composure at this stage of the interview that he was able to remain firm in his assertions that he was not the shooter and was not involved in any robbery scheme. Therefore, while the use of this tactic contributes to the totality of circumstances, we give it relatively little weight. Compare *Commonwealth* v. *Novo*, 442 Mass. at 267-269.

c. *Assurances.* The motion judge's decision was grounded in

the detectives' use of "the interrogation technique employing the repetition of the theme that [the defendant] could get himself out of this jam; that he could [s]eparate [him]self from the murder, and that he could by providing a statement of the kind the officers were seeking, 'be out of the picture.' " We agree that this effort, which began in earnest approximately one hour and forty minutes into the interview, carried with it the forbidden "intimation that the defendant would be exonerated." *Commonwealth* v. *Meehan*, 377 Mass. 552, 565 (1979).

"What is prohibited, if a confession is to stand, is an assurance, express or implied, that it will aid the defense or result in a lesser sentence." *Id.* at 564. Here, in order to extract an admission that the defendant had provided Leonard with a gun, the detectives falsely told him several times that Rodriguez's death would not be his "fault" if Leonard was the shooter and had acted "like a cowboy"; and when the defendant probed this assurance, O'Connor told him that if, hypothetically, O'Connor gave the defendant a gun, and the defendant acted like a cowboy, it would not be O'Connor's "fault" if the defendant shot someone.

The detectives then minimized the defendant's involvement, stating that they knew the defendant "had no intention that [Leonard] was going to use it to kill somebody" and that is why they were trying to help him foreclose anyone from thinking that he gave Leonard the gun to kill Rodriguez and get his money. They mischaracterized the law of murder, drawing a false dichotomy between giving Leonard the gun "to kill" the victim and giving Leonard the gun "to scare" the victim. This theme reached its height when O'Connor said, "Kill him or scare him? Kill him, you're in this for a *capital murder*. Scare him, wrong place, wrong time, the cowboy screwed up" (emphasis added).

These were especially egregious remarks. Knowledgeable persons might know that the death penalty had been abolished in the Commonwealth and that a "capital crime" refers to a charge of murder in the first degree. See *Commonwealth* v. *Perkins*, 464 Mass. 92, 96 n.9 (2013). However, it could well be expected that the defendant would be misled into thinking that he would be exposed to capital punishment if he failed to

admit that he gave Leonard the gun only to scare the victim.[5] The remarks further suggested that if the defendant did make such an admission, he, as distinct from the "cowboy" who "screwed up," would not be culpable at all. At a minimum, the detectives misrepresented the defendant's exposure to charges of murder in the first degree on the theories of felony-murder or aiding and abetting (joint venture). See *Commonwealth* v. *Baye*, *supra* at 250 & n.7.

The detectives continued in this vein, insisting that the defendant give them some other reason for providing the gun to Leonard. They drew another false distinction — between giving Leonard the gun "to rob" the victim and giving him the gun "for protection" — and they again assured the defendant that if he told them the reason Leonard wanted the gun, the defendant would be "out of the picture." Unlike his reaction to the detectives' false statements about the state of the evidence, where he appeared able to identify the tactics for what they were, the defendant was plainly swayed by this line of improper interrogation, and, ultimately, he admitted giving Leonard the gun "for protection."

5. *Extent of suppression.* It follows from the foregoing discussion that the motion judge properly ordered suppression of "statements following the introduction of the theme that the defendant could 'separate [himself] from the murder' or otherwise be less culpable." After the judge's ruling, the Commonwealth filed a motion for clarification asking the judge to identify the precise point in the interview at which the defendant's statement would be suppressed. The judge responded by identifying selective pages and lines to be suppressed,[6] beginning at page 120, line nineteen of the interview transcript, when, after the most coercive of the assurances had been made, the defendant finally began to abandon his firm and consistent position that he had not given Leonard a gun.

We agree that this is the point at which it fairly may be concluded that the defendant's will was overborne by the improper

[5]The defendant averred in his affidavit, "I understood capital murder to expose me to the death penalty."

[6]The judge identified thirteen specific passages, some only a sentence or two long. Essentially, the judge suppressed any statements wherein the defendant admitted to the possession of the firearm used in the shooting.

tactics employed by the detectives. However, we conclude that the selective suppression of statements made thereafter is not a proper remedy. Other statements made after the defendant's will was overborne are no less tainted by the improper police tactics and cannot reasonably be said to be voluntarily made. Accordingly, all subsequent statements made by the defendant must be suppressed. See, e.g., *Commonwealth* v. *Ashley*, 82 Mass. App. Ct. 748, 756 (2012).

*Conclusion.* As modified to suppress all statements made by the defendant from and after line nineteen of page 120 of the interview transcript, the order partially allowing the defendant's motion to suppress, and the subsequent ruling on the Commonwealth's motion for clarification, are affirmed.

*So ordered.*